# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**MICHAEL J. KYLE**
Baldwin Adams & Kamish
Franklin, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**CHRISTINE REDELMAN**
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) ) ) ) | |
| R.A. (Minor Child) | ) ) | |
| AND | ) ) | |
| S.W. (Father) | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 41A05-1402-JT-60 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE JOHNSON CIRCUIT COURT
The Honorable K. Mark Loyd, Judge
The Honorable Marla K. Clark, Magistrate
Cause No. 41C01-1308-JT-00025

**October 22, 2014**

**OPINION – FOR PUBLICATION**

**VAIDIK, Chief Judge**

**Case Summary**

S.W. ("Father") learned that he was R.A.'s father while incarcerated awaiting trial on a number of criminal charges. R.A. had previously been adjudicated a child in need of services (CHINS), and Father was ordered to participate in a variety of services upon his release. Six months later, however—while Father was still detained pending trial—a petition was filed to terminate his parental rights. At the time of the termination hearings, Father remained in pretrial detention, and his availability to parent R.A. in the future was uncertain. However, Father's sister was available to care for R.A. and had already begun visiting with R.A. The trial court ultimately terminated Father's parental rights, and he appeals.

We conclude that a number of the trial court's findings are not supported by the evidence, and setting those findings aside, we conclude that there is insufficient evidence to support the trial court's decision to terminate the parent-child relationship. We therefore reverse.

**Facts and Procedural History**

B.A. ("Mother") gave birth to a son, R.A., in October 2011.[1] Mother lacked appropriate housing, and in January 2012 the Johnson County Department of Child Services (JCDCS) removed R.A. from Mother's care and filed a petition alleging that he

---

[1] Mother's parental rights were terminated, and she does not participate in this appeal.

was a CHINS. The trial court adjudicated R.A. a CHINS a short time later. At some point in her dealings with JCDCS, Mother identified Father as R.A.'s biological father, which was confirmed by DNA testing in October 2012.

Father, meanwhile, was incarcerated in the Johnson County Jail awaiting trial on several criminal charges, including sexual misconduct with a minor, theft, and possession of paraphernalia.[2] He received a letter informing him that he was R.A.'s father in December 2012. One month later, Father admitted that R.A. was a CHINS based on R.A.'s previous CHINS adjudication and his inability to parent R.A. due to his incarceration. Appellant's App. p. 15. Father agreed to participate in a number of services upon his release from incarceration. *Id.* at 16.

Six months later, however, JCDCS filed a petition to terminate Mother's and Father's parental rights. The trial court held two hearings on the petition in September and November 2013.

The majority of the evidence presented at the termination hearings pertained to Mother, as only two of the individuals involved in the case had ever met or spoken to Father. Family Case Manager Elizabeth Shertzer (FCM Shertzer) told the court that she met with Father in jail and he provided a list of relatives who might be willing to care for R.A. Tr. p. 64. FCM Shertzer also discussed services with Father:

> [W]e could offer him Engaging Fathers, which is indicated in the [paternity] letter, as well. Uh, [Father] declined participation in Engaging Fathers. We kind of also talked about that if he did participate in anything in the jail, uh such as, like AA, or any of those services that are provided by the jail . . . we could potentially, uh, see if that counted towards his

---

[2] At the time he filed his appellate materials, Father was still incarcerated awaiting trial. *See* Appellant's Br. p. 3 n.2.

disposition, dispositional goals once they were set up. So at that point, he didn't have dispositional goals.

*Id.* at 66. FCM Shertzer admitted, however, that she had "no knowledge of what [Father's] ability to parent would be." *Id.* at 70. She also testified that to her knowledge, Father "did not know that he was a parent prior to this case, and [he] had no involvement with [R.A.]" as a result.[3] *Id.* Family Case Manager Ashley Peterson (FCM Peterson) described a meeting with Father in which he articulated a plan for caring for R.A. post-incarceration:

| | |
|---|---|
| FCM Peterson: | [I]n April of 2013 he said that if he was released he would find a place and get the things that [R.A.] needed, like bottles and baby clothes. |
| Counsel: | How old was [R.A.] at the time? |
| FCM Peterson: | He was about one and a half. |
| Counsel: | Okay, were bottle[s] and baby clothes necessary for [R.A.'s] care at the time? |
| FCM Peterson: | Yes. |
| Counsel: | Did he express a knowledge as to [R.A.'s] development[al] needs? |
| FCM Peterson: | No. |

*Id.* at 84-85.

Like FCM Shertzer, FCM Peterson testified that she had no knowledge of "what kind of parent [Father] would be because he ha[d] been incarcerated" throughout the

---

[3] The dissent says that Father "made no attempt to establish a relationship with the child before he was incarcerated." Slip. op. at 4. The record indicates, however, that Father may not have known that he was a parent before his incarceration.

4

CHINS and termination proceedings, but she said that the Fatherhood Engagement program was "a good place[] to start." *Id.* at 90-91.

A number of professionals testified about their interactions with Mother, and they recommended terminating her parental rights. Anne Kieffer, R.A.'s Court Appointed Special Advocate (CASA), recommended terminating both parents' rights because she did not believe that "[Mother] can be a good mother. And [Father], who I don't know[,] isn't going to be available for awhile . . . ." *Id.* at 103. CASA Kieffer admitted that she had never spoken with Father. *Id.* at 100.

Father appeared at both hearings and testified that he would be willing to consent to his sister adopting R.A., but he otherwise opposed termination of his parental rights. *Id.* at 129. At the time of the termination hearings, Father's sister and her husband had filed an adoption petition and begun visiting with R.A. *Id.* at 127.

In closing, Father's counsel argued that JCDCS had acted prematurely in filing its termination petition:

> This is a man who right now [is] cloaked in a presumption of innocence. He is not sitting in jail right now because of any current convictions, he has pending charges. And it is really easy to think that well[,] he could be going away for a long time but we just don't know right now and I think [JC]DCS's petition is a little premature because we don't know what is going to happen with [Father] right now. We just don't. He has a hearing in a couple of weeks, it could resolve this case. He could be out in two weeks, we don't know. The [S]tate could decide not to pursue the charges or he could be acquitted at trial. He is cloaked in that presumption of innocence, yet in this s[e]tting it is almost guilty until proven innocent. There has been no evidence whatsoever about his ability to parent or not to parent. He didn't have a burden to show that he could parent. [JC]DCS had to show by clear and convincing evidence that what led to the removal of [R.A.] was going to be eliminated and we don't know that, we just don't know. It is too early to know whether or not [Father] is going to be able to parent his own child.

5

*Id.* at 133-34. Regarding services, counsel also noted that "regarding [Father's] dispositional goals . . . the order itself stated subject to his release from incarceration[,] [F]ather agrees to do the following things[,] and we are not there yet. He hasn't had that opportunity." *Id.* at 134.

At the end of the hearing, the trial court concluded that JCDCS had met its burden and granted the termination petition. *Id.* at 136. In December 2013 the court issued its order formally terminating both parents' rights. The order included the following relevant findings:

> 2. [Father] has been established as the natural father of the child through DNA testing. There has not been a paternity action initiated to establish [Father] as legal father.
>
> \* \* \* \* \*
>
> 36. Father joined in the CHINS matter and agreed to dispositional goals by Order dated January 15, 2013. A number of dispositional goals were ordered "subject to release from incarceration." Those goals are similar to those ordered for Mother . . . . An addition[al] goal of "Father will participate in Fatherhood Engagement" was also included in the order.
>
> 37. It is not known when Father will be released from jail. Many of the dispositional goals, such as establishing housing [and] providing supervision for the child, contemplate Father NOT being incarcerated. However, Fatherhood Engagement was a service specifically named in the dispositional order and was available to Father during incarceration. Fatherhood Engagement would have been provided to him in the jail and would have provided Father with parenting education and helped him to understand the age-appropriate needs of the child, and in this way, put Father in a better position to parent the child upon his release.
>
> 38. Father refused to participate in Fatherhood Engagement when specifically asked about it by FCM Shertzer and FCM Peterson. The only service in which Father wanted to participate was a "Breaking Chains" program offered at the Johnson County Jail. This service can be referred by the court in the criminal matter. [FCM] Peterson directed Father to his attorney in the criminal matter to request a court order for the Breaking

6

Chains program. Father did not follow through with this and has not participated in the Breaking Chains program.

39. FCM Peterson asked Father what his plans with regard to the child's care were if he (Father) were to be released. Father's reply was that he would buy the child baby bottles and clothes. The child was well over one year old when Father made this statement, demonstrating a lack of knowledge as to the age-appropriate needs of the child.

\* \* \* \* \*

43. Ann Kieffer is the CASA volunteer assigned to the child. She related the child is well-bonded to his foster family and that termination of the parent-child relationship would be in the child's best interests based on the parents' lack of participation in services and the length of time the child has been in foster care.

Appellant's App. p. 2, 6-7. The trial court went on to conclude:

5. In considering whether Ind[iana] Code [section] 31-35-2-4(b)(2)(B)(i) and (ii) have been met, the court must judge a parent's fitness to care for the child at the time of the hearing, taking into consideration evidence of changed conditions. The court may consider services offered to the parent and the parents' responses to those services as well. . . . [F]ather lacked basic knowledge of age-appropriate developmental needs of the child. He refused to participate in the service that was available to him to gain that knowledge.

6.[4] As to the threat to the child's well-being, the same evidence outlined above proves that continuation of the parent-child relationship poses a threat to the child's well-being. . . . [F]ather [] has failed to demonstrate an interest in parenting the child since having been established the natural father. Father clearly lacks knowledge of parenting but refused the service available to him to educate him on parenting. Father was not able to articulate a plan for caring for the child should he be released from incarceration soon. The parents have therefore clearly demonstrated a lack of interest in providing appropriate care to the child. To continue the parent-child relationship under these circumstances would pose a threat to the child's well-being.

---

[4] This conclusion is incorrectly numbered in the court's order. It should be Conclusion 6, followed by Conclusions 7 and 8. *See* Appellant's App. p. 7-8.

7

7. Termination of the parent-child relationship is in the child's best interests. . . . [F]ather [] did not demonstrate an interest in the child's well-being by refusing services.

8. [JC]DCS has a satisfactory plan for the care and treatment of the child, which is adoption.

*Id.* at 7-8 (citations omitted).

Father filed a motion to correct errors, which was denied. He now appeals.

**Discussion and Decision**

"The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013) (citations omitted). The parent-child relationship is one of our culture's most valued relationships. *Id.* (citation omitted). "And a parent's interest in the upbringing of their child is 'perhaps the oldest of the fundamental liberty interests recognized by the courts.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). But parental rights are not absolute—"children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships." *Id.* (citations omitted). Thus, a parent's interests must be subordinated to a child's interests when considering a termination petition. *Id.* (citation omitted). A parent's rights may be terminated if the parent is unable or unwilling to meet his or her parental responsibilities by failing to provide for the child's immediate and long-term needs. *Id.* (citations omitted).

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Id.* at 1229 (citation omitted). Instead, we consider only the evidence and reasonable inferences that support the judgment. *Id.*

8

(citation omitted). "Where a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous." *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, "we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." *Id.* (citation omitted).

The threshold question in this case is whether the evidence supports the trial court's findings. In its order terminating Father's parental rights, the trial court made the following findings:

> 2. [Father] has been established as the natural father of the child through DNA testing. There has not been a paternity action initiated to establish [Father] as legal father.
>
> \*     \*     \*     \*     \*
>
> 36. Father joined in the CHINS matter and agreed to dispositional goals by Order dated January 15, 2013. A number of dispositional goals were ordered "subject to release from incarceration." Those goals are similar to those ordered for Mother . . . . An addition[al] goal of "Father will participate in Fatherhood Engagement" was also included in the order.
>
> 37. It is not known when Father will be released from jail. Many of the dispositional goals, such as establishing housing [and] providing supervision for the child, contemplate Father NOT being incarcerated. However, Fatherhood Engagement was a service specifically named in the dispositional order and was available to Father during incarceration. Fatherhood Engagement would have been provided to him in the jail and would have provided Father with parenting education and helped him to understand the age-appropriate needs of the child, and in this way, put Father in a better position to parent the child upon his release.
>
> 38. Father refused to participate in Fatherhood Engagement when specifically asked about it by FCM Shertzer and FCM Peterson. The only service in which Father wanted to participate was a "Breaking Chains"

9

program offered at the Johnson County Jail. This service can be referred by the court in the criminal matter. [FCM] Peterson directed Father to his attorney in the criminal matter to request a court order for the Breaking Chains program. Father did not follow through with this and has not participated in the Breaking Chains program.

39. FCM Peterson asked Father what his plans with regard to the child's care were if he (Father) were to be released. Father's reply was that he would buy the child baby bottles and clothes. The child was well over one year old when Father made this statement, demonstrating a lack of knowledge as to the age-appropriate needs of the child.

\* \* \* \* \*

43. Ann Kieffer is the CASA volunteer assigned to the child. She related the child is well-bonded to his foster family and that termination of the parent-child relationship would be in the child's best interests based on the parents' lack of participation in services and the length of time the child has been in foster care.

Appellant's App. p. 2, 6-7.

The evidence supports Finding 2: Father has not filed a petition to formally establish R.A.'s paternity. The remaining findings, however, are problematic. As to Findings 37 and 38, the evidence indeed shows that Father declined to participate in Fatherhood Engagement, a program available to him in the Johnson County Jail. The evidence also shows that Father did not participate in Breaking Chains, a program apparently available to criminal defendants. But while the evidence may support these findings, Finding 37 acknowledges that Father was not ordered to participate in Fatherhood Engagement until after his release from incarceration, a fact his attorney repeated at trial and in his motion to correct errors. *See* Tr. p. 134; Appellant's App. p. 11-13. And Father has never been ordered to participate in Breaking Chains; there is no evidence in the record about this program or Father's eligibility to participate in it.

10

Finding 39 is based on the following exchange between counsel and FCM Peterson:

FCM Peterson: [I]n April of 2013 [Father] said that if he was released he would find a place and get the things that [R.A.] needed, like bottles and baby clothes.

Counsel: How old was [R.A.] at the time?

FCM Peterson: He was about one and a half.

Counsel: Okay, were bottle[s] and baby clothes necessary for [R.A.'s] care at the time?

FCM Peterson: Yes.

Counsel: Did he express a knowledge as to [R.A.'s] development[al] needs?

FCM Peterson: No.

Tr. p. 84-85. The trial court concluded that Father's reply demonstrated "a lack of knowledge as to the age-appropriate needs of the child." Appellant's App. p. 6. Yet FCM Peterson stated that R.A. needed bottles and baby clothes when Father made this statement. The trial court may have intended Finding 39 to reflect FCM Peterson's statement that Father "did not express a knowledge" of R.A.'s developmental needs, but there was no elaboration on this point, and in light of Father's plan to purchase things that his child did in fact need, we cannot say that Finding 39 is supported by the evidence.

Finding 43 is likewise not supported by the evidence. The court found that CASA Kieffer recommended termination of the parent-child relationship "based on the parents' lack of participation in services and the length of time the child has been in foster care." *Id.* at 7. In fact, CASA Kieffer recommended termination "because the mother, I don't

11

think [Mother] can be a good mother. *And the father, who I don't know[,] isn't going to be available for awhile*[,] and [R.A.] is doing so well where he is now." Tr. p. 103 (emphasis added). Thus, the CASA based her recommendation for terminating Father's parental rights solely on his incarceration and unavailability to parent for an undetermined length of time—not his failure to participate in services.

Setting the erroneous findings aside, we conclude that the remaining findings do not support termination. In order to terminate a parent's parental rights "the State must prove, by clear and convincing evidence, each and every element set forth in Indiana Code section 31-35-2-4(b)(2), (A)-(D)." *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009), *reh'g denied.* Relevant to this case, the State must prove that "[t]here is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied," or that "there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child." Ind. Code § 31-35-2-4(b)(2)(B).

With respect to these elements, the trial court concluded:

5. In considering whether Ind[iana] Code [section] 31-35-2-4(b)(2)(B)(i) and (ii) have been met, the court must judge a parent's fitness to care for the child at the time of the hearing, taking into consideration evidence of changed conditions. The court may consider services offered to the parent and the parents' responses to those services as well. . . . [F]ather lacked basic knowledge of age-appropriate developmental needs of the child. He refused to participate in the service that was available to him to gain that knowledge.

6. As to the threat to the child's well-being, the same evidence outlined above proves that continuation of the parent-child relationship poses a threat to the child's well-being. . . . [F]ather [] has failed to demonstrate an interest in parenting the child since having been established the natural father. Father clearly lacks knowledge of parenting but refused the service

12

available to him to educate him on parenting. Father was not able to articulate a plan for caring for the child should he be released from incarceration soon. The parents have therefore clearly demonstrated a lack of interest in providing appropriate care to the child. To continue the parent-child relationship under these circumstances would pose a threat to the child's well-being.

Appellant's App. p. 7-8. We cannot say that Father's refusal to participate in services while in jail means that the conditions that led to R.A.'s removal or placement outside the home will not be remedied—or that the continuation of the parent-child relationship poses a threat to R.A.'s well-being. As explained above, Father was not ordered to participate in Fatherhood Engagement until *after* his release from incarceration, and he was never ordered to participate in Breaking Chains. Moreover, FCM Shertzer and FCM Peterson both testified that they had no knowledge of Father's parenting abilities; FCM Peterson simply testified that Fatherhood Engagement was "a good place [] to start." Tr. p. 91.

The other evidence cited by the court with respect to R.A.'s well-being is also insufficient. The court concluded that Father failed to demonstrate an interest in parenting R.A. after he received the DNA test results. After learning that he was R.A.'s father, six months passed before JCDCS filed its termination petition. During this time, Father could have filed a petition to formally establish R.A.'s paternity, but he never did, and this undoubtedly speaks to Father's interest in parenting his son. But the other evidence does not: the record does not, as the trial court states, establish that "Father clearly lacks knowledge of parenting" or that he was "not able to articulate a plan for caring for the child should he be released from incarceration soon." Appellant's App. p. 8. As set forth above, FCM Peterson testified that Father articulated a plan for caring for

13

R.A. if he were to be released, and neither she nor FCM Shertzer had any knowledge of Father's parenting abilities. Tr. p. 70, 90.

To summarize, Father learned that he was R.A.'s father while incarcerated awaiting trial. He was ordered to participate in a number of services after his release from incarceration. But just six months later—while Father was still incarcerated pending trial—JCDCS filed a petition to terminate his parental rights. And one month later, the court began hearing evidence on the termination petition. At the time of the termination hearings, Father's sister was available to care for R.A. and had already begun visiting with R.A. Because Father remained incarcerated, however, his availability to parent R.A. in the future was uncertain. That uncertainty, together with the unique facts of this case—particularly the six-month time frame from DNA testing to termination filing, the involvement of father's family, and the post-incarceration services requirement—leads us to the conclusion that reversal is warranted. Despite the dissent's suggestion that Father's actions "have foreshadowed what is to come," slip op. at 4, termination is only appropriate when the State proves each relevant element of the termination statute by clear and convincing evidence, and it failed to do so here.

The purpose of terminating parental rights is not to punish the parent but to protect the children involved. *In re D.B.*, 942 N.E.2d 867, 872 (Ind. Ct. App. 2011) (citing *In re K.S.*, 750 N.E.2d 832 (Ind. Ct. App. 2001)). The involuntary termination of parental rights is the most extreme sanction a court can impose on a parent because termination severs all rights of that parent to his or her children. *Id.* (citing *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008)). For this reason, termination is intended as a last resort,

14

available only when all other reasonable efforts have failed. *Id.* While we are aware of the fact that R.A. is currently living in a loving pre-adoptive foster home, a parent's constitutional right to raise his or her own child may not be terminated solely because there may be a better home available for that child. *Id.* (citing *K.S.*, 750 N.E.2d at 836).

Because JCDCS failed to carry its burden of establishing, by clear and convincing evidence, that there is a reasonable probability the conditions leading to the R.A.'s removal or placement outside the home will not be remedied and that continuation of the parent-child relationship poses a threat to R.A.'s well-being, we reverse the trial court's order terminating Father's parental rights.[5]

Reversed.

MAY, J. concurs.

FRIEDLANDER, J. dissents with separate opinion.

---

[5] Because we reach this conclusion, we need not address the parties' arguments regarding R.A.'s best interests.

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE ) 
TERMINATION OF THE PARENT- ) 
CHILD RELATIONSHIP OF: ) 
  ) 
R.A. (Minor Child) ) 
  ) 
    AND ) 
  ) 
S.W. (Father) ) 
  ) 
    Appellant-Respondent, ) 
  ) 
        vs. )     No. 41A05-1402-JT-60
  ) 
THE INDIANA DEPARTMENT OF ) 
CHILD SERVICES, ) 
  ) 
    Appellee-Petitioner. ) 

**FRIEDLANDER, Judge, dissenting**

With but one minor exception, I believe the trial court's findings are supported by the evidence and that the evidence supports termination of S.W.'s parental rights to R.A. Therefore, I would affirm the trial court's judgment and respectfully dissent from the majority's decision to do otherwise.

Concerning the minor exception mentioned above, I agree with the Majority that Finding 39 is problematic. But considering the substance of that finding in the context of the trial court's ruling, any error concerning Finding 39 is of small import. My fundamental disagreement with the Majority concerns Findings 37 and 38, and, to a

16

lesser extent, Finding 43. Findings 37 and 38 address S.W.'s refusal to participate in the Fatherhood Engagement program while he was in jail. The findings indicate that this program was available to S.W. while he was in jail, that he was asked to participate in the program, and that he declined. The findings further indicated that although S.W. was not interested in participating in a program that might be helpful to him in learning to parent his child – not to mention *useful* to him (with respect to the CHINS and termination proceedings) in his endeavor to establish and maintain a relationship with that child – he expressed interest in participating only in a program called "Breaking Chains". Ultimately, he did not participate in that program either. The Majority acknowledges that the evidence supports these findings but concludes that his refusal to participate in those programs does not support the conclusion that the conditions that led to R.A.'s removal or placement outside the home would not be remedied. This in turn is based upon the fact that S.W. was not *ordered* to participate in those programs in the first place. It is true that he was not ordered to participate in those programs, but in my view that does not negate the validity of the inference drawn by the trial court that S.W.'s refusal to do so foreshadows what is to come.

While incarcerated on charges of sexual misconduct with a minor, theft, reckless possession of paraphernalia, and possession of paraphernalia, S.W. learned that he was R.A.'s biological father. At that point, he joined the CHINS matter and agreed to dispositional goals, which were set out by the trial court in a January 15, 2013 "Order on Facilitation". The CHINS court accurately summarized those goals as follows:

> [M]aintain appropriate housing; provide proof of financial resources sufficient to provide for the family; allow DCS/CASA to visit announced or

17

unannounced; pay child support as ordered; remain in contact with the FCM; notify FCM of changes in household composition; not use, consume, or distribute controlled substances; demonstrate the ability to meet the child's physical and age-appropriate supervisory needs; execute consents for release of information; contact DCS within forty-eight (48) hours of his release from incarceration; participate in home-based case management upon release; undergo a parenting assessment and follow through with the recommendations therein; submit to random drug screens; undergo substance-abuse assessment; participate in parenting time and case planning conferences.

*Appellant's Appendix* at 6. Moreover, paragraph (q) of the January 15 order included the following condition: "Father will participate in Fatherhood Engagement". *Id.* at 17. Paragraphs (a)-(p) of the January 15 order consisted of multiple conditions that S.W. was required to meet, but which were not relevant (e.g., "Father will maintain housing that is appropriate for family size that provides at least the minimum level of care") until he was released from incarceration. *Id.* at 16. Thus, they were made "subject to his release from incarceration" in the order. *Id.* There was one condition, however, that he could satisfy while incarcerated – participate in the Fatherhood Engagement program. Aware that his parental rights were in jeopardy, S.W. nonetheless refused to do this.

In order to terminate parental rights, the State must establish, among other things, that the conditions that resulted in a child's removal from the home will not be remedied. In making this determination, a court first must identify the conditions that led to placement outside the home, and second must determine whether there is a reasonable probability that those conditions will not be remedied. *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Co. Office*, 989 N.E.2d 1225 (Ind. 2013). The second task is an exercise in prediction. When a court determines that the conditions that led to the child's

18

removal from the home are not likely to be remedied, it must evaluate the parent's conduct or pattern of conduct and decide what that portends for the future.

Although it is not clear when S.W. became aware that he had fathered a child, it is clear that he was not incarcerated for the whole of R.A.'s life. Yet, S.W. made no attempt to establish a relationship with the child before he was incarcerated. When definitely apprised of that fact while incarcerated, he refused to complete the Fatherhood Engagement program at a time when he cannot plausibly claim to have been too busy to do so or indeed to cite any other logistical impediments as an excuse for failing to participate. There is no indication that he exerted any effort to establish a relationship with the child from jail. Moreover, it is not insignificant that S.W. acknowledged at the termination hearing that he had signed a consent for his sister to adopt R.A.

Our Supreme Court has acknowledged that a trial court may consider past behavior as the best predictor of a parent's future behavior. *See In re E.M.*, 4 N.E.3d 636 (Ind. 2014). Moreover, in this case I am particularly mindful of one the guiding considerations when called upon to review a termination of parental rights, i.e., that "a trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship." *In re N.Q.*, 996 N.E.2d 385, 391 (Ind. Ct. App. 2013). S.W.'s actions and failures to act have foreshadowed what is to come. Moreover, the conclusion that the continued presence of S.W. in R.A.'s life will not be in R.A.'s best interest is supported by the evidence of what S.W. has done, and refused to do, thus far. Upon this basis, I believe the petition to terminate is sustainable on this record, and respectfully dissent from the decision to reverse it.