## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 12 2018, 6:20 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Worthley
Worthley Law LLC
Valparaiso, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re: The Matter of The Termination of Parental Rights of: P.C., J.B., and W.B. *(Minor Children)*

and

P.C. *(Father)*,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

April 12, 2018

Court of Appeals Case No. 64A05-1709-JT-2333

Appeal from the Porter Circuit Court

The Honorable Mary Harper, Judge

The Honorable Gwenn Rinkenberger, Magistrate

Trial Court Cause Nos.
64C01-1701-JT-37
64C01-1701-JT-38
64C01-1701-JT-39

**Robb, Judge.**

# Case Summary and Issue

[1] P.R.C. ("Father") appeals the juvenile court's termination of his parental rights to his children, raising the sole restated issue of whether the juvenile court's termination order is supported by clear and convincing evidence. Concluding the termination order is not clearly erroneous, we affirm.

# Facts and Procedural History

[2] Father is the parent of three children; P.C., born October 2, 2010; and twins, J.B. and W.B., born May 3, 2013 (collectively, "Children"). The Children resided with J.M.B. ("Mother")[1] from birth until July 2014, when the Indiana Department of Child Services ("DCS") received notice that Mother had refused a drug screen and was being evicted from the shelter where she had been living. DCS planned to place J.B. and W.B. with Father, who P.C. was already visiting, but when Father arrived at the DCS offices having transported P.C. with him, DCS observed that Father was intoxicated and notified law enforcement. Responding officers administered a portable breath test, which revealed a blood alcohol content of .085, and DCS refused to release the Children to Father.

[3] On July 23, 2014, the Children were removed from Mother and Father on an emergency basis. That same day, DCS filed a petition alleging the Children

---

[1] Mother's parental rights were terminated on August 28, 2017, and she is not a party to this appeal.

were children in need of services ("CHINS"). Father admitted to the allegations contained in the CHINS petition, and the Children were adjudicated CHINS on August 5, 2014.

[4] Father was absent from a subsequent dispositional hearing on September 2, 2014, due to incarceration. Services were ordered for Mother, and Father was ordered to participate in supervised visitation with the children, complete a clinical interview and assessment, undergo random drug and alcohol screens, and participate in parenting classes and case management services. On December 2, 2014, the juvenile court held a review hearing and found Father was not in compliance with the case plan. Father was again ordered to complete services. Mother, who was present at the hearings, was found to be partially compliant.

[5] Maternal Aunt agreed to become the placement for the Children and Mother began living there as well. Sometime before July 2015, however, Mother was kicked out of Maternal Aunt's home and P.C. was placed with Paternal Grandmother and J.B. and W.B. were placed in kinship care. A permanency review hearing was held on July 14, 2015, and Father appeared in person for the first time. The juvenile court adopted a concurrent plan of reunification and adoption.

[6] During this time, DCS received an anonymous report that P.C. was acting out sexually. P.C. stated that Father had "stuck his peepee in her peepee," and P.C. attempted to kiss several DCS case managers on the lips. Transcript,

Volume I at 33. Mother stated that P.C. told her that Father had touched her inappropriately but that "she didn't take what [P.C.] was saying seriously." *Id.* at 34. DCS later conducted a forensic interview with P.C. and confirmed these allegations.

[7] After leaving a shelter, Mother moved into a friend's basement—planning to move the Children there as well. DCS' inspection, however, revealed that the basement was moldy; had a cement and partial dirt floor; was unfinished with standing water; and was generally unsafe. DCS, unsurprisingly, denied Mother's request. Mother continued to be non-compliant and the Children were moved from kinship care to foster care.

[8] The juvenile court held a review hearing on October 26, 2015. The juvenile court found that both Mother and Father had failed to comply with the case plan and that DCS had made reasonable efforts to reunify or preserve the family. The juvenile court also granted DCS' request that the case plan for the Children be modified from reunification to adoption. Sometime after the October 26 hearing, Father contacted DCS and stated that he wanted to begin services. He denied having alcohol issues and DCS arranged for a clinical evaluation and for other services to be provided.

[9] At a review hearing on January 19, 2016, the juvenile court again found that neither Mother nor Father had complied with the case plan, cooperated with DCS, or enhanced their ability to fulfill their parental obligations. DCS, however, recommended changing the permanency plan from adoption back to

reunification with a concurrent plan of adoption "so as to . . . provide [F]ather with reasonable efforts." *Id.* at 46. Father completed a psychological evaluation but refused to sign a release of information so that DCS could determine whether he was receiving treatment for alcoholism.

[10] At a review hearing on April 25, 2016, the juvenile court accepted DCS's recommendation and modified the permanency plan. The court found that Father had not complied with the case plan or cooperated with DCS ordered Father to complete psychological testing and individual counseling, submit random drug screens, and participate in case management services. Due to the safety concerns regarding the allegations of sexual abuse, the court entered a no contact order between Father and P.C. At another hearing on July 12, the juvenile court found that Father was in compliance with the plan but not to a degree that would permit safe reunification. Services were again ordered for Father.

[11] On January 17, 2017, DCS filed its termination petition. Following evidentiary hearings held in May, June, and August, the juvenile court issued its order terminating both Mother and Father's parental rights and making 161 findings of fact,[2] relevant portions of which we note:

> 58.    In April of 2016, the Court was concerned because Father tested positive for synthetic marijuana; continued to deny alcoholism; did not sign a consent form to release

---

[2] We commend the juvenile court for its thorough findings of fact, which have aided our review of this case.

information regarding alcohol treatment; and was accused of molesting his daughter.

* * *

61. P.C. was consistent over time with her allegation that "dad stuck his pee-pee in her pee-pee". Additionally[,] her behaviors were, and continue to be consistent with a child who was sexually molested, including mounting other children; talking about her body; and trying to kiss the [family case manager] using her tongue. The Court finds the child, P.C., to be credible and finds for purposes of this Order that the Court believes P.C. and believes there is evidence to establish by clear and convincing evidence that the molestation occurred.

62. The inappropriate behavior of P.C. was observed by Mother; Foster Parents; and the [family case manager].

63. By July of 2016 and October of 2016, it became clear that Father was "partially compliant" but was not able to be "safely" reunified with the three Children.

64. Father was sporadic in his employment and maintained part-time jobs for only a short period.

65. Father had no license as it was suspended as a result of previous D.U.I.'s.

66. Father was testing positive for alcohol and continued to drink.

67. Neither the [family case manager], nor [the court-appointed special advocate], nor the Service Providers

could get in contact with Father, and he was non-compliant.

68. The Court found that Father was non-compliant, did not enhance his ability to parent, and changed the plan to Adoption in October, 2016, over Father's objection.

69. Between October 2016 and January 2017, Father began to reluctantly participate in services. He tested positive for alcohol in September, October, November, and December.

70. Father was lying to service providers about his jobs and his alcohol consumption.

71. On January 17, 2017, the Court found the Parents to be non-cooperative and noncompliant. Parents did not enhance their ability to parent, despite the reasonable efforts being made by DCS. The Court reaffirmed the Case Plan of Adoption.

72. The drug screens of Father for 9/30/16; 10/20/16; 11/21/16 and 01/05/17 were all positive for alcohol. The Court found then, and finds now, that it is highly improbable Father will remedy his alcoholism.

* * *

77. The Court denied a request and recommendation that Father have therapeutic supervised visits with the twins. The Court believed and continues to believe that visitation with the twins was not in their best interest given the facts of the case.

78. The Court believes the following facts support a termination of Father's parental rights: Father missed an entire reporting period (7/16 - 10/16); Father refuses to admit that he has a problem with alcohol so he cannot remedy it; Father drinks and drives; Father admitted to beginning to drink as early as 6:00 a.m. and drinking "quarts"; Father spent most of this case in jail; Father continues to test positive for alcohol; Father has a suspended license and two open cases under two different Courts; [t]here is evidence to support the fact that Father molested P.C.; Father lied to service providers; Father is diagnosed with alcoholism and antisocial behavior disorder; Father's home was dirty, unsanitary, and covered with cat feces; Father only recently obtained a full time job after having several part time jobs and Father has not enhanced his ability to parent.

* * *

82. Based upon a review of [a psychological] report and the testimony of Dr. Schwartz, the Court finds the following facts:

   a. Father only provided "temporary" care and supervision of his daughter, P.C.;

   b. Father has two (2) other daughters from a previous relationship with whom he has no contact;

   c. Mother had primary physical custody of his three Children, P.C.; W.B.; and J.B. even though Mother relied on welfare and public housing to care for and support the Children;

d. Father has been in and out of prisons due to convictions for eighteen (18) felony charges occurring between 2003 and 2014;

e. Father's felony convictions are for burglary; shoplifting; auto theft and D.U.I.;

f. Father was seriously injured when he had an accident while driving under the influence. He hit a tree and was hospitalized;

g. Father has a history of excessive daily use of alcohol and regular use of marijuana;

h. Father lied to Dr. Schwartz about his continued use of alcohol and told him he had been sober throughout this case;

i. Father is impulsive and displays reckless disregard for the safety of himself and others;

j. Father shows a lack of remorse and lack of emotional accountability;

k. Father will continue to engage in antisocial behavior as long as he continues to drink, which he has;

l. Father demonstrates symptoms of psychopathy that indicates problems with impulsivity, aggression, juvenile delinquency and irresponsibility;

m. Father will not modify or change his behaviors;

n.  Father is an alcoholic with antisocial personality disorder and he poses a threat to the health, safety and welfare of his Children.

83. The Court also heard testimony from Susan Lovaas and Amanda Tompkins from Family Focus. Based upon the reports submitted as [exhibits] and the testimony provided, the Court finds the following facts:

a.  Family Focus was to provide services to Father to help him maintain sobriety and strengthen parenting skills;

b.  Father lied to the Service Providers about his drinking and alcoholism, and told them he remained sober throughout the case;

c.  Father did not remain sober throughout the case and continued drinking;

d.  Father did not successfully complete the program even though he completed the education piece of the program;

e.  Father has been incarcerated for the majority of his adult life;

f.  Father was being supported by his girlfriend;

g.  Father's intoxication almost always precipitated his criminal behaviors;

h.  Father has an anger issue;

i.      Father lied to the Service Provider about where he was and they saw him at the local bar and restaurant drinking;

j.      When the Service Provider made an unannounced visit, Father was sitting on the porch with a cold beer;

k.      Father's brother was incarcerated and released during this time frame, moving in with Paternal Grandparents.

84.    The Service Providers testified and the Court finds that the home Father was living in with his girlfriend was not appropriate for children. The home had a strong odor of urine; there was debris on the floor including garbage; there was cat feces on the floor in the laundry room; and the kitchen was dirty. Additionally, there was a machete sitting in the living room.

85.    Amanda Tomkins had several safety concerns as it relates to Father parenting the Children, as does the Court. The Court finds the condition of the home was inappropriate; Father continues to have alcohol issues; Father has a hard time maintaining employment; and Father has anger issues as he exhibited on numerous occasions to the Service Providers.

* * *

95.    Mother testified at the hearing. The Court finds Mother to be a credible witness and a loving parent who knows she is unable to safely parent P.C., W.B. and J.B.

\* \* \*

100. Mother testified and the Court finds her testimony credible and adopts as facts the following from her testimony:

   a.   When P.C. was younger, around the age of two (2), she had constant rashes; yeast infections and bladder infections;

   b.   The doctor who saw P.C. for these rashes and yeast infections advised Mother these were signs of severe abuse and insinuated P.C. was the victim of sexual abuse. The appointments occurred prior to the DCS case being opened in July of 2014;

   c.   Mother observed behaviors from P.C. that are consistent with having been sexually abused, including trying to French kiss her;

   d.   P.C. told Mother during this DCS case that "I don't want to see daddy anymore" and "Don't let him come to our home." This occurred when Mother was staying with her sister;

   e.   Mother regrets now, her failure to recognize the signs of sexual abuse;

   f.   Mother, Father and P.C. were residing for a time at a homeless shelter in South Bend, Indiana and Mother believes the molestation by Father occurred then.

Appealed Order at 8-18.

Based on these findings of fact, the juvenile court concluded:

> 4. The conditions that resulted in the children's removal have not been remedied, and are unlikely to be remedied. A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children. DCS has provided numerous services to the parents to address the reasons for the [C]hildren's removal as well as the reasons for continued removal. . . . Father has an extensive history of alcoholism that remains unaddressed. He was consistently deceptive in his dealings with DCS and service providers attempting to assist him in acquiring the tools to remain sober. Instead he cancelled appointments and continued drinking alcohol, rather than working with the therapist and home-based case manager to address his alcoholism. He continued to abuse alcohol despite DCS' efforts to provide services to assist him to become sober, all while living with a girlfriend who is employed as a bartender and demonstrates a pattern of enabling his addiction. It is highly unlikely that the conditions that resulted in the [C]hildren's removal will ever be remedied.
>
> 5. The continuation of the parent-child relationship poses a threat to the well-being of the children. The Court need not wait until the parents' deficient lifestyle irreversibly influences their child's physical, mental and social growth, or for the child to be otherwise permanently impaired before terminating the parent-child relationship. . . . Reunification with Father also poses a serious threat to the children due to his unaddressed issues with alcoholism, history of incarcerations and unwillingness or refusal to practice safe parenting practices with the [C]hildren. An active no contact order is currently in effect to protect [P.C.] from Father. [P.C's] allegations of sexual abuse by

Father are credible. Her description of the incidents of sexual abuse by [F]ather have been consistent over time and among various providers and to DCS throughout the entirety of the CHINS proceedings and the no contact order issued is in [P.C.'s] best interest. Despite diligent efforts by DCS to provide services to the parents to address the reasons for the [C]hildren's removal and continued removal, the behavior of the parents remains unchanged. Neither parent has enhanced their ability to parent which poses a serious threat to the children if they are reunified with either parent.

*Id.* at 29-30 (citations omitted). Father now appeals.

# Discussion and Decision

## I. Standard of Review

[13] When we review a termination of parental rights, we neither weigh the evidence nor judge witness credibility and we consider only the evidence and reasonable inferences most favorable to the judgment. *In re C.G.*, 954 N.E.2d 910, 923 (Ind. 2011). In reviewing the juvenile court's findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id.* However, where, as here, a party:

challenges only the judgment as contrary to law and does not challenge the special findings as unsupported by the evidence, we do not look to the evidence but only to the findings to determine whether they support the judgment.

*Smith v. Miller Builders, Inc.*, 741 N.E.2d 731, 734 (Ind. Ct. App. 2000). "We will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. Clear error is that which leaves us with a definite and firm conviction that a mistake has been made." *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1123 (Ind. Ct. App. 2013) (citation omitted).

## II. Termination Order

[14] On appeal, Father contends the juvenile court's termination order is clearly erroneous. Specifically, Father claims the State failed to present clear and convincing evidence to establish there is a reasonable probability that the conditions resulting in the Children's removal will not be remedied, or a reasonable probability the continuation of the parent-child relationship poses a threat to the Children's well-being. We disagree.

[15] We begin, as we often do in these cases, by noting the traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *Matter of M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. "[T]he relationship between a parent and child is one of the most valued within our culture." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015). "However, these parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Matter of M.B.*, 666 N.E.2d at 76. This resulting termination of parental rights is

"an extreme measure that is designed to be used as a last resort when all other reasonable efforts have failed . . . ." *In re K.W.*, 12 N.E.3d 241, 249 (Ind. 2014).

[16] Indiana Code section 31-35-2-4(b)(2) sets out what the State must prove in order to terminate parental rights. This section provides, in relevant part, that the State must prove:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child[; and]
>
> * * *
>
> (C) that termination is in the best interests of the child . . . .

*Id.* The provisions of Indiana Code section 31-35-2-4(b)(2)(B) are written in the disjunctive, and thus the State need only prove one of the statutory elements. *In re L.S.*, 717 N.E.2d 204, 209 (Ind. Ct. App. 1999), *trans. denied, cert. denied*, 534 U.S. 1161 (2002). The State must prove each element by clear and convincing evidence. Ind. Code § 31-34-12-2; *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009). Furthermore, if a juvenile court determines the allegations of the

petition are true, then the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

## A. Remedy of Conditions

When determining whether the conditions leading to the Children's removal will not be remedied, the juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions. *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). "[I]t is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. The court must also evaluate a parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *In re A.B.*, 924 N.E.2d at 670. However, the court cannot focus solely on a parent's historical conduct to the exclusion of evidence as to their current circumstances or evidence of changed conditions. *In re C.M.*, 960 N.E.2d 169, 175 (Ind. Ct. App. 2011). The court may also consider the services the State offered to the parent and the parent's response to such services. *In re A.B.*, 924 N.E.2d at 670.

In arguing the State failed to meet its burden to prove the conditions will not be remedied, Father claims the juvenile court erroneously relied upon his incarceration during the termination proceedings. In support thereof, Father

cites *In re R.A.*, 19 N.E.3d 313 (Ind. Ct. App. 2014), *trans. denied.* However, Father's reliance on this case is misplaced because the facts of *In re R.A.* are easily distinguishable from the record before us. There*,* as Father himself explains, we reversed a juvenile court where the court terminated parental rights based "solely on father's incarceration and unavailability to parent for an undetermined length of time—not his failure to participate in services." Brief of Appellant at 12. Indeed, the parent in *In re R.A.* was not even ordered to participate in services "until *after* his release from incarceration" and both family case managers testified that they had no knowledge of the father's parenting abilities. *In re R.A.*, 19 N.E.3d at 321. This is far from the case before us. Here, Father was released from jail some *two years* before the termination of his parental rights and he was provided ample opportunity to participate in services. And, as opposed to the silent record in *In re R.A.* regarding the parent's parenting abilities, this record is full of evidence regarding Father's parenting abilities—or lack thereof.

[2] Next, Father relies on our supreme court's decision in *In re G.Y.*, 904 N.E.2d 1257 (Ind. 2009), for the proposition that termination is not in the best interest of the child when a parent has taken positive steps "and made a good faith effort to better his or herself as a person and as a parent by completing services aimed at substance abuse, parenting education, and obtaining employment[.]" Br. of Appellant at 13. In *In re G.Y.*, the juvenile court found that it was not reasonably probable conditions would be remedied because providing the parent—who was yet to be released from jail—with additional time to attempt

to remedy the conditions for her child's removal would "only necessitate [the child] being put on a shelf instead of providing paramount permanency." *Id.* at 1263. Reversing, our supreme court noted the parent's "good-faith effort" to complete services, completion of drug treatment, individualized drug counseling, and the fact that she secured both "suitable housing" and "gainful employment" upon her release. *Id.* at 1263.

[3] While the parent in *In re G.Y.* was "producing very positive results[,]" *id.,* we share no such optimism here. The juvenile court found that rather than addressing his "extensive history of alcoholism," Father "was consistently deceptive in his dealings with DCS and service providers attempting to assist him in acquiring the tools to remain sober." Appealed Order at 29. Instead, Father "continued to abuse alcohol despite DCS' efforts to provide services to assist him to become sober, all while living with a girlfriend who is employed as a bartender and demonstrates a pattern of enabling his addiction." *Id.* Father tested positive for alcohol on four occasions and has been in and out of prison as the result of eighteen felony convictions. We have consistently held that a court may consider evidence of a parent's prior criminal history and history of drug and alcohol abuse. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). And we have warned that parents who "pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *C.T. v. Marion Cnty. Dep't of Child Servs.*, 896 N.E.2d 571, 585 (Ind. Ct. App. 2008), *trans. denied.*

Moreover, the "statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *In re N.Q.*, 996 N.E.2d at 392 (quotation and citation omitted). Here, the juvenile court found by clear and convincing evidence that Father molested P.C., a finding that goes unchallenged on appeal. At the time of the termination hearing, these significant concerns about Father's behavior had not been addressed, much less remedied. *See S.L.*, 997 N.E.2d at 1125 (holding that unaddressed allegations of father's sexual misconduct supported the trial court's finding that the reasons for placement outside the home will not be remedied).

Given the court's extensive and unchallenged findings, we conclude that there was no reasonable probability that Father would remedy the conditions resulting in Children's removal. *See In re D.W.*, 969 N.E.2d 89, 97 (Ind. Ct. App. 2012) (trial court's finding that parent failed to take advantage of services and failed to stay drug-free supported its conclusion the conditions causing children's removal from parent's home would not be remedied).

## B. Well-being of the Children

Father also challenges the juvenile court's conclusion that continuation of the parent-child relationship poses a threat to the well-being of the Children.[3] The

---

[3] Although, as noted above, the provisions of Indiana Code section 31-35-2-4(b)(2)(B) are written in the disjunctive and thus the foregoing discussion is sufficient to terminate Father's parental rights.

State argues that it is not safe for Father to have contact with the Children and we agree with the State.

[7] We have cautioned that a court need not wait until a child is irreversibly harmed such that his physical, mental or social development is permanently impaired before terminating the parent-child relationship. *J.L.L. v. Madison Cty. Dep't of Pub. Welfare,* 628 N.E.2d 1223, 1227 (Ind. Ct. App. 1994). Here, as the State correctly points out, the juvenile court was not forced to rely on speculation because Father has already caused untold harm to P.C. Moreover, placement with Father was initially denied because he arrived at the DCS office attempting to pick up the twins while over the legal limit and having transported P.C. There is overwhelming evidence as to Father's history with alcohol and substantial evidence that such abuse continues. *See In re A.P.,* 981 N.E.2d 75, 81 (Ind. Ct. App. 2012) (noting that a trial court should consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation). Therefore, we cannot say that the juvenile court clearly erred in concluding that Father posed a threat to the well-being of the Children.

# Conclusion

[8] The juvenile court's unchallenged findings clearly support its judgment terminating Father's parental rights. Accordingly, we affirm the termination of Father's parental rights.

Affirmed.

Najam, J., and Altice, J., concur.