## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 31 2020, 10:21 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of K.D. (Minor Child)

and

K.G. (Father) and N.B. (Mother),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

March 31, 2020

Court of Appeals Case No. 19A-JT-2545

Appeal from the Orange Circuit Court

The Honorable Steven L. Owen, Judge

Trial Court Cause No. 59C01-1804-JT-86

**Crone, Judge.**

## Case Summary

[1] K.G. ("Father") appeals the trial court's order involuntarily terminating his parental relationship with his minor child, K.D. ("Child"). Finding that he has failed to establish clear error, we affirm.

## Facts and Procedural History

[2] The facts most favorable to the judgment are as follows. In July 2015, N.B. ("Mother") gave birth to Child.[1] Indiana Department of Child Services ("DCS") received a report from the hospital that Mother had tested positive for THC. Mother admitted to using methadone and marijuana, and Child's meconium screen was positive for marijuana. Mother agreed to participate in an informal adjustment program. In September 2015, DCS removed Child from Mother's care on an emergency basis due to allegations of Mother's drug use, housing instability, and failure to follow the recommendations of the informal adjustment.

---

[1] Mother's parental rights also were terminated, but she is not participating in this appeal. As such, we refer to Mother only where relevant to our discussion concerning Father.

[3]     In October 2015, DCS filed a petition seeking to have Child adjudicated a child in need of services ("CHINS"). A November 2015 DNA test identified Father as Child's biological father. Father had not had any relationship with Child up to that point. DCS Family Case Manager ("FCM") Penny Deon testified that Father told her he was "homeless," "wasn't sure where he was going to be," and "didn't have a phone." Tr. Vol. 2 at 85. He also admitted that he used illegal substances. In December 2015, DCS set up services for Father, which included submitting to random drug screens and participating in a clinical assessment, home-based case work, a substance use disorder assessment, and supervised visitation. FCM Robin Brown testified that between December 15, 2015, and March 9, 2016, Father attended six visits with Child and canceled or failed to show up for five visits.[2] *Id.* at 118.

[4]     In January 2016, Child was placed in relative care with her paternal aunt and her husband, where she has remained since. Both Father and Mother admitted to the CHINS allegations, and in March 2016, the trial court adjudicated Child a CHINS. In its August 2016 dispositional order, the trial court ordered Father to maintain a stable and legal source of income, start/continue the services already in place such as a drug treatment program, maintain contact with DCS, refrain from committing domestic violence, and attend all supervised visitation sessions. Meanwhile, as of spring 2016, Father was incarcerated for drug

---

[2] Several progress reports issued during the pendency of the CHINS proceedings indicate that Father attended three out of four scheduled supervised visits with Child, with the last one being in January 2016. The reason for this discrepancy is unclear.

offenses. He was referred for services inside the Department of Correction ("DOC"), but the services were discontinued. During his times outside the DOC, Father did not complete the ordered services. Father remained in prison until February 2018. After his release, he met with FCM Amanda Bills to discuss services and visitation. He was re-incarcerated a week later and was released in June 2018.

[5] Meanwhile, in May 2018, DCS changed the permanency plan to adoption and filed a petition to terminate Mother's and Father's parental rights. Father had not seen Child since early 2016 and had not completed his court-ordered services. After his June 2018 release, he did not contact DCS about services or visitation. FCM Bills testified that she had tried to reach him at the phone number he provided but was unsuccessful. The termination proceedings were continued several times, and the factfinding hearing was eventually conducted on September 30, 2019. At that time, Father was living in a halfway house and had a job. He had not visited Child and had not completed services. Service providers testified at the factfinding hearing that Child was bonded with her preadoptive relatives and that DCS's plan of termination and adoption was in Child's best interests. On October 7, 2018, the trial court issued an order with findings of fact and conclusions thereon terminating Mother's and Father's parental relationships with Child. Father now appeals. Additional facts will be provided as necessary.

# Discussion and Decision

[6] Father asserts that the evidence is insufficient to support the termination of his parental rights. When reviewing a trial court's findings of fact and conclusions thereon in a case involving the termination of parental rights, we first determine whether the evidence supports the findings and then whether the findings support the judgment. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We will set aside the trial court's judgment only if it is clearly erroneous. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re A.G.*, 45 N.E.3d 471, 476 (Ind. Ct. App. 2015), *trans. denied* (2016). Unchallenged findings stand as proven, and we simply determine whether the unchallenged findings are sufficient to support the judgment. *T.B. v. Ind. Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012), *trans. denied*; *see also McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (unchallenged findings are accepted as true). In conducting our review, we neither reweigh evidence nor judge witness credibility. *E.M.*, 4 N.E.3d at 642. Rather, we consider only the evidence and inferences most favorable to the judgment. *Id*. "[I]t is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by the appellant before there is a basis for reversal." *Best v. Best*, 941 N.E.2d 499, 503 (Ind. 2011) (citations omitted).

[7] "Parents have a fundamental right to raise their children—but this right is not absolute. When parents are unwilling to meet their parental responsibilities,

their parental rights may be terminated." *Matter of Ma.H.*, 134 N.E.3d 41, 45-46 (Ind. 2019) (citation omitted). To obtain a termination of a parent-child relationship, DCS is required to establish in pertinent part:

> (A) that one (1) of the following is true:
>
> ….
>
> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[8] In recognition of the seriousness with which we address parental termination cases, Indiana has adopted a clear and convincing evidence standard. Ind. Code § 31-37-14-2; *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 377 (Ind. Ct. App. 2006), *trans. denied.* "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013) (citation omitted). "[I]f the court finds that the allegations in a [termination] petition … are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added).

## Section 1 – Father has failed to establish that the trial court clearly erred in concluding that there is a reasonable probability that the conditions that resulted in Child's removal will not be remedied.

[9] Father asserts that the trial court clearly erred in concluding that a reasonable probability exists that the conditions that led to Child's removal will not be remedied. When assessing whether there is a reasonable probability that conditions that led to a child's removal will not be remedied, we must consider not only the initial basis for the child's removal but also the bases for continued placement outside the home. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied.* Moreover, "the trial court should judge a parent's fitness to

care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. "Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* In making its case, "DCS need not rule out all possibilities of change; rather, [it] need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). The court may properly consider evidence of a parent's substance abuse, criminal history, lack of employment or adequate housing, history of neglect, and failure to provide support. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).

[10] The conditions that formed the basis for Child's initial removal were Mother's drug use and neglect and Child's positive test at birth for THC. Father entered the proceedings when his paternity was established. During the CHINS proceedings, Father was ordered to maintain contact with DCS and to notify the FCM of changes in his phone number, address, and other information critical to maintaining contact. He also was required to participate in a substance abuse assessment and intensive family preservation and drug treatment, attend all scheduled visitation sessions, secure and maintain suitable, safe, and stable housing, secure and maintain a stable source of income, and obey the law. FCM Bills testified that DCS was unable to provide services for Father when he was incarcerated.

[11]   Father specifically challenges the sufficiency of the evidence to support the following findings:

> 32.  Father failed to participate in the Substance Use Disorder Assessment.
>
> ….
>
> 39.  Father failed to provide weekly drug screens for DCS. Father provided three (3) drug screens for FCM Amanda Bills in over three (3) years.
>
> 40.  Father did not engage in or successfully complete any program to address his substance use during more than three (3) years of Father's involvement in the CHINS case.

Appealed Order at 4.

[12]   Father is correct concerning finding 32, as the record indicates that he participated in a substance abuse assessment while in the Martin County jail. With respect to finding 40, there is no indication that Father ever underwent a drug treatment program despite having completed an assessment.  As for finding 39, the record shows that he had four positive screens between November 2015 and May 2016 and a negative screen on his first release from the DOC in February 2018.  That said, the first sentence of finding 39 is, in fact, correct in that Father did not provide weekly drug screens.

[13]   Father maintains that the trial court merely relied on his historical failures and did not consider his parenting ability as of the time of the factfinding hearing.

He relies on *In re C.M.*, 960 N.E.2d 169, 175 (Ind. Ct. App. 2011), where another panel of this Court reasoned,

> the court's focus on historical conduct, absent factual findings as to Mother's current circumstances or evidence of changed conditions, is akin to terminating parental rights to punish the parent. And, without more, the findings are insufficient to establish each element necessary to support the conclusion that termination is warranted in this case.

[14] The trial court did not simply rely on Father's 2016 patterns of conduct but also took into consideration his current circumstances. *See* Appealed Order at 4 (unchallenged finding 41: "Father has failed to address the instability in his life as demonstrated by his recurring incarcerations, lack of stable housing, and admitted substance use."). During the hearing, the court acknowledged Father's stable housing at the time of the factfinding hearing but also noted that it was a halfway house, where Child was not allowed. We are mindful that Father's incarceration placed certain limitations on DCS's ability to provide him services. However, fifteen months elapsed between Father's second release from the DOC and the factfinding hearing, and there is absolutely no evidence that that he engaged in any treatment or parenting programs during that time. To the extent that he blames DCS, we remind him that DCS is not statutorily required to provide parents with services prior to seeking termination of the parent-child relationship. *In re T.W.*, 135 N.E.3d 607, 612 (Ind. Ct. App. 2019), *trans. denied* (2020). Nevertheless, FCM Bills attempted to contact Father following his second release and asked him for his phone number at a court

hearing; yet, she was unsuccessful in reaching him at the number provided. Tr. Vol. 2 at 169. Father knew the location and phone number of DCS's office but did not contact FCM Bills. He now essentially claims that there was nothing he could do once the permanency plan changed to adoption and termination. The protraction of the proceedings due to continuances meant that Father could have taken the initiative to enter a substance abuse treatment program or requested supervised visitation. He could have taken steps in the interim but did not. Simply put, Father has failed to establish that the trial court clearly erred in concluding that there is a reasonable probability that the conditions that led to Child's removal will not be remedied.

## Section 2 – Father has failed to establish that the trial court clearly erred in concluding that termination is in Child's best interests.

[15] Father also challenges the trial court's conclusion that termination of the parent-child relationship is in Child's best interests. To determine what is in the best interests of a child, we must look at the totality of the circumstances. *In re A.W.*, 62 N.E.3d 1267, 1275 (Ind. Ct. App. 2016). The trial court "need not wait until a child is irreversibly harmed before terminating the parent-child relationship." *S.E. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 37, 47 (Ind. Ct. App. 2014), *trans. denied*. Although not dispositive, permanency and stability are key considerations in determining the child's best interests. *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a

finding that termination of parental rights is in the best interests of the children." *In re A.P.*, 981 N.E.2d 75, 82 (Ind. Ct. App. 2012) (quoting *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007), *trans. denied*). Likewise, "the testimony of service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010), *trans. dismissed*.

[16] Here, FCM Bills testified at length concerning her reasons for recommending termination and adoption as the best plan for Child. She emphasized the extensive period of time that Mother and Father had been given to address their issues and contrasted the strong bond that Child has developed with her preadoptive relatives. She described her three-and-a-half-year observations of Child in her current placement as follows:

> [W]hen you come in it looks like a normal parent-child relationship because to her it is. That is what she has always known … she is the smartest four year old I have ever met and I feel that she thrives in the placement environment that … she is nurtured, she is, she seeks their approval and when she gets it she glows [], she responds to discipline more, I guess better than she used to now that we've kind of put those services in place to help with that because like I said she definitely ruled the roost for a while there. She, she grows, she thrives. I've had that opportunity to see her grow from an infant to a four year old and she's meeting all of her developmental milestones and you know, she's, she has been able to grow and thrive in that home and she truly does see it as a home.

Tr. Vol. 2 at 161.

[17] Court appointed special advocate ("CASA") Margaret McGirt also testified that termination of Father's rights and adoption by relative placement is in Child's best interests. She, too, emphasized that the preadoptive relatives are the only family that Child has ever known and that they have given her stability that Father cannot provide. The trial court specifically found CASA McGirt's testimony to be credible, Appealed Order at 5, and we cannot reassess witness credibility. *E.M.*, 4 N.E.3d at 642.

[18] We reject Father's argument that the trial court improperly terminated his rights based solely on evidence that preadoptive relatives can provide a "better" home for Child. *See In re R.A.*, 19 N.E.3d 313, 321 (Ind. Ct. App. 2014) (mere fact children are in better home cannot be sole basis for termination), *trans. denied* (2015). As discussed, evidence concerning Father's failure to maintain contact with DCS so that he could complete services and engage in visitation after his release from incarceration and the professional opinions of the service providers is sufficient to show that the trial court did not base its decision on a mere preference between Father and the preadoptive relatives. Father's failure to exercise his visitation rights when he was able to do so indicates a lack of commitment to the parent-child relationship and the plan to preserve it. *See Lang,* 861 N.E.2d at 372 (failure to exercise right to visit one's children demonstrates lack of commitment to complete actions necessary to preserve parent-child relationship).

[19] Father also claims that "there is no reason to rush the termination process" and asks that Child be continued in her relative placement under a guardianship so

that he may be afforded more time to prove that he is earnest in his desire to parent her. Appellant's Br. at 20. He relies on *In re R.S.*, where our supreme court stated, "when a child is in relative placement, and the permanency plan is adoption into the home where the child has lived for years already, prolonging the adoption is unlikely to have an effect upon the child." 56 N.E.3d 625, 630 (Ind. 2016). However, in *R.S.*, there was ample evidence of the father's consistent efforts at visiting the child even up to the time of the factfinding hearing. *Id.* Not so here, as Father has not visited Child since before his 2016 incarceration and has simply deflected and cast blame on DCS for his lack of effort to maintain contact with DCS and Child since he was released from the DOC in June 2018. Moreover, FCM Bills testified that Father had threatened and pressured the preadoptive parents to accept a guardianship and that as a result, the preadoptive parents did not consider a guardianship arrangement to be safe. Tr. Vol. 2 at 170. Additionally, in considering the totality of the circumstances, we cannot ignore the protracted nature of these proceedings, which extended from early 2016 (Father's last visit) through the September 2019 factfinding hearing. This amounts to three and a half of the first four years of Child's life and portends an increase in potential trauma associated with waiting even longer to remove her from the only home she has ever known. Child has waited long enough and need not wait indefinitely for Father to turn his life around. *See S.E.*, 15 N.E.3d at 47 (trial court "need not wait until a child is irreversibly harmed before terminating the parent-child relationship."). Father has failed to demonstrate that the trial court clearly erred in concluding that termination is in Child's best interests.

[20] Finally, we acknowledge Father's concern that his parental rights should not be terminated solely on the basis of his incarceration. Our supreme court has emphasized that incarceration is an insufficient basis upon which to terminate a parent's rights. *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 644 (Ind. 2015) (citing *In re G.Y.*, 904 N.E.2d at 1264-66). However, the record here clearly shows that the trial court examined the totality of the circumstances and did not rely solely on what Father did not or could not do as a result of his incarceration but also on what he failed to do when he was not incarcerated. We find significant unchallenged finding 33, which states that Father's only participation in services occurred when he *was* incarcerated. Appealed Order at 4. Based on the foregoing, we conclude that Father has failed to demonstrate that the trial court clearly erred in terminating his parental relationship with Child. Accordingly, we affirm.

[21] Affirmed.

Bailey, J., and Altice, J., concur.