# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 30 2020, 9:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT J.G.

Joann M. Price Franklin
Merrillville, Indiana

ATTORNEY FOR APPELLANT C.T.

Karyn Price
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Involuntary Termination of the Parent-Child Relationship of:

P.F. and J.G. *(Minor Children)*

and

J.G. *(Father)* and C.T. *(Mother)*,

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner,*

September 30, 2020

Court of Appeals Case No. 20A-JT-437

Appeal from the Lake Superior Court

The Honorable Thomas P. Stefaniak, Judge

Trial Court Cause Nos.
45D06-1907-JT-186
45D06-1907-JT-187

**Robb, Judge.**

# Case Summary and Issue

[1] C.T. ("Mother") is the mother of two children, P., born in 2009, and J., born in 2015. P.'s father is J.F. and J.'s father is J.G. ("Father"). The parental rights of all three parents were terminated in one proceeding. J.F. did not appear at the termination hearing and does not participate in this appeal. Mother and Father independently appeal the termination of their parental rights, but we restate each of their issues as one: whether the juvenile court's order is clearly erroneous.[1] Concluding termination of Mother's and Father's parental rights is not clearly erroneous, we affirm.

# Facts and Procedural History

[2] Mother and Father resided together with P. and J. in Highland, Indiana. On December 8, 2017, Highland police officers responded to a call about a child running barefoot in the street. Officers found J. and identified his home, which they entered through the unlocked front door. Father was not in the home; Mother was there, but asleep. Officers yelled loudly but were unable to wake her. They were only able to rouse her when they physically shook her. Officers referred the family to the Department of Child Services ("DCS"), but Mother

---

[1] Neither Mother nor Father filed an appendix that conforms with Indiana Appellate Rule 50(A). Neither appendix includes a copy of the chronological case summary as required by Rule 50(A)(2)(a). In fact, Father's appendix contains only one of the documents set forth under Rule 50(A)(2), namely, the appealed order. It also includes selected pages of the transcript, but Rule 50(A)(2)(h) states that the appendix shall contain "any record material relied on in the brief *unless the material is already included in the Transcript*[.]" We would remind counsel to review and follow the appellate rules when submitting an appeal to this court in the future.

and Father did not make themselves available to DCS for several weeks after this incident. Upon finally meeting with Mother on December 28, DCS assessment worker Tessa Brooks requested she submit to a drug screen, but she declined. DCS obtained an order compelling Mother to submit to an oral drug screen and a hair follicle test; the oral screen was positive for fentanyl and the hair follicle was positive for heroin, morphine, and codeine. Brooks also offered Father a drug screen when she met with him on January 5, 2019. Father refused but did admit to recently using opiates and marijuana. A later drug screen returned positive for fentanyl. DCS took emergency custody of both P. and J. on January 5 due to lack of appropriate supervision, substance use in the home, and concerns for their safety and welfare. The children were placed with their maternal grandmother ("Grandmother").

[3] Based on the events of December 8, the results of the drug screens, and the fact that DCS had been involved with the family previously when J. tested positive for heroin at birth, DCS filed a child in need of services ("CHINS") petition for each child on January 9. At the initial hearing, Mother and Father were ordered to complete a substance abuse evaluation and a parenting assessment and follow all recommendations; complete random drug screens twice a week; participate in supervised visitations; and participate in individual therapy. The children were to remain with Grandmother.

[4] At a hearing on May 14, Mother and Father admitted that the children were CHINS and the juvenile court adjudicated them accordingly and proceeded to disposition. DCS was awarded wardship of the children and they were to

remain in relative care. Mother and Father were ordered to follow all recommendations from their substance abuse evaluations and parenting assessments; to submit to random drug screens twice a week; and to participate in individual therapy to address their substance abuse. Mother was also ordered to participate in an in-patient treatment program, and supervised visits were to continue at Grandmother's home. The permanency plan was reunification with Mother.

[5] Christina Olejnik was the permanency family case manager for the family from January of 2018 until February of 2019. During that year, Mother completed the substance abuse and parenting assessments and visited regularly with the children. She was mostly compliant with submitting to drug screens and completed the recommended parenting education. She was inconsistent with individual substance abuse therapy and went through eight or nine different treatment programs, attending each only briefly if at all. Father also completed the substance abuse and parenting assessments, completed parenting education, and visited with the children. He participated in the random drug screens but was inconsistent in participating in individual substance abuse therapy. He did complete a seven- to ten-day inpatient program but did not successfully complete several intensive outpatient programs. Olejnik described their pattern of compliance as:

> Typically, we would meet, have Child and Family Team Meetings, they would come up with a plan, then they would not follow through with that plan. And then typically right before court, they would talk about wanting to have a Team Meeting or

getting into some type of treatment prior to the court hearing. . . . [After court hearings,] they would either admit that they had relapsed and used, or they would not follow through with those treatment programs.

Transcript, Volume II at 78. Mother and Father were open with Olejnik "pretty much every month in explaining . . . what they had used and when they had used." *Id.* When confronted with their drug screen results, they typically admitted to having used heroin, although they had been unaware in the beginning they were also getting fentanyl as "their dealer was supposed to just be giving them heroin[.]" *Id.* at 79. Although Mother and Father attended supervised visits and were appropriate and bonded with the children, their continued substance abuse, lack of follow through with treatment, and lack of commitment to making a lifestyle change was a concern for the length of time Olejnik had the case and she never considered transitioning the children back to them.

[6] Katherine Pardonek offered individual substance abuse therapy to Mother for a year beginning in October 2018. The goal of the therapy was for Mother to obtain and then maintain her sobriety and work through the emotional distress that both causes and is caused by her substance abuse issues. Mother's participation was inconsistent; she only successfully met with Pardonek for fifteen sessions out of the over 100 sessions they should have had. And because of her inconsistency, her progress was minimal.

[7] After a periodic case review and permanency hearing in July of 2019, at which the juvenile court heard evidence that Mother and Father continued to consistently test positive for heroin and fentanyl and to be removed from treatment programs for noncompliance, the court changed the permanency plan to termination of parental rights and adoption of the children by Grandmother.

[8] On July 31, 2019, DCS filed a petition for involuntary termination of Mother's and Father's rights to the children. The parties appeared for a hearing on January 15, 2020. Theresa Abell, who became the family case manager in October 2019, testified that both Mother and Father had completed intensive outpatient treatment programs since she took over the case, but Mother had then tested positive for fentanyl in December 2019 and had not participated in further drug screens and Father had refused drug screens in December of 2019 and January of 2020.

[9] Mother testified she began using marijuana when she was a teenager and had been using heroin for approximately six years. She unwittingly began taking fentanyl when it was cut into her heroin. The longest she has been drug-free since she began using was one year, after DCS was involved with the family the first time. Mother admitted she continued to use heroin and fentanyl during this case despite participating to varying degrees in nearly a dozen treatment programs. At the end of 2019, Mother completed the eighteen sessions of an intensive outpatient treatment program but did not attend any of the twelve step meetings that are also required to obtain a completion certificate, nor did she attend any aftercare group sessions. Of the documented drug screens she

completed between January 23, 2018 and June 24, 2019, she tested positive for some form of illegal substance 34 out of 36 times and she failed to submit to a screen over 100 times. She testified at the termination hearing that she last used heroin "[a] couple days ago." Tr., Vol. II at 10. And she acknowledged that she was not currently in a position to safely and adequately parent the children "[b]ut it doesn't mean [I can't] later[.]" *Id.* at 25.

[10] Father likewise admitted he had continued to use heroin and fentanyl throughout this case. Of Father's documented drug screens between January 9, 2018 and September 16, 2019, he tested positive for some form of illegal substance 87 out of 97 times. Father stated he had been drug free since September 2019, but also admitted he had used heroin the day before the hearing. He had participated in three or four treatment programs, obtaining a completion certificate from one within thirty days of the hearing. Like Mother, Father acknowledged now would not be the right time to have the children returned to them, but thought they just needed a little more time to show they could and would do better.

[11] Grandmother testified that Mother is "very good with the children" during visits, she and the children are bonded, and if not for her drug use, she would be a fine parent. *Id.* at 142. She also testified that Father loves the children and they love him "a lot[,]" although they are closer to Mother. *Id.* at 147. In particular, Grandmother noted that although P. understands he is not able to go home right now, he would "love" to go back to live with Mother. *Id.* at 144. She noted that P. would be "very upset" about being adopted, but it was

decided adoption would be preferable to a guardianship because "with guardianship, it's open-ended. The boys will . . . wonder when they're going to be able to go back home, and they probably never will. And so, this makes it permanent and then they could work on that and then move on." *Id.* at 145. Grandmother stated that notwithstanding the emotional bonds between the parents and children, "I think that they couldn't parent their children today the way they are." *Id.* at 147. When asked if she thought the timeframe DCS offered for Mother and Father to obtain sobriety gave them an adequate opportunity to succeed, Grandmother stated, "[I]f there was something in place where they could . . . go inpatient right now and work on their sobriety and they had to stay, yeah, then, give them more time. But, if it's going to continue like this, then we're wasting our time, because nothing has changed." *Id.* at 148.

[12] The juvenile court issued its order on termination on January 27, 2020, concluding that there is a reasonable probability that the conditions that resulted in the children's removal from the parents' home will not be remedied and that the continuation of the parent-child relationship poses a threat to the children's well-being because "[b]y the parents [sic] own admission, they have serious drug problems and even under the umbrella of the Department of Child Services and under the umbrella of their parental rights possibly being terminated, the parents have continued to use illegal drugs[.] The history of the drug use cannot be ignored and the children deserve permanency. . . . It would be unfair to the children to delay such permanency on the very remote

likelihood of the parents committing to and completing services." [Father's] Appellant's Appendix, Volume 2 at 5. Mother and Father each appeal the juvenile court's decision.

# Discussion and Decision

## I. Standard of Review

The Fourteenth Amendment to the United States Constitution protects the right of parents to establish a home and raise their children. *In re Adoption of O.R.*, 16 N.E.3d 965, 972 (Ind. 2014). But the law also provides for the termination of those rights when parents are unable or unwilling to meet their parental responsibilities. *In re J.S.*, 133 N.E.3d 707, 714 (Ind. Ct. App. 2019). We acknowledge that the parent-child relationship is "one of the most valued relationships in our culture[,]" but we also recognize that "parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights." *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010) (quotation omitted). The involuntary termination of parental rights is the most extreme sanction a court can impose because termination severs all rights of a parent to their children. *In re R.A.*, 19 N.E.3d 313, 321 (Ind. Ct. App. 2014), *trans. denied*. As such, termination is intended as a last resort, available only when all other reasonable efforts have failed. *Id.* The purpose of terminating parental rights is to protect children, not to punish parents. *In re C.D.*, 141 N.E.3d 845, 852 (Ind. Ct. App. 2020), *trans. denied*.

Indiana Code section 31-35-2-4(b)(2) sets out the elements that DCS must allege and prove to terminate a parent-child relationship (in pertinent part):

> (A) that one (1) of the following is true:
>
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> * * *
>
> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove each element by clear and convincing evidence. Ind. Code § 31-37-14-2.[2] If the juvenile court finds the allegations are true, "the court shall terminate the parent-child relationship." Ind. Code § 31-35-2-8(a). In doing so, the juvenile court must enter findings and conclusions. Ind. Code § 31-35-2-8(c). We will not set aside the findings or judgment unless they are clearly erroneous. *Z.B. v. Ind. Dep't of Child Servs.*, 108 N.E.3d 895, 900 (Ind. Ct. App. 2018) (quotation omitted), *trans. denied*. To determine whether a judgment terminating parental rights is clearly erroneous, we consider "whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016) (quotation omitted). We do not reweigh the evidence or judge the credibility of witnesses but consider only the evidence and reasonable inferences most favorable to the judgment. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). Neither Mother nor Father challenges any of the juvenile court's factual findings as being clearly erroneous. We therefore accept the findings as true and determine only whether these unchallenged findings clearly and

---

[2] Indiana Code sections 31-35-2-4(b)(2)(A) and (B) are written in the disjunctive, and therefore the court need only find that one of the requirements of subsection (b)(2)(A) and one of the requirements of subsection (b)(2)(B) was established by clear and convincing evidence. *See In re L.S.*, 717 N.E.2d 204, 209 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied*, 534 U.S. 1161 (2002).

convincingly support the judgment. *In re A.M.*, 121 N.E.3d 556, 562 (Ind. Ct. App. 2019), *trans. denied*.

# II. Termination of Parental Rights

Mother and Father have filed separate briefs in this consolidated appeal. To reiterate, Mother is the biological mother of both P. and J. and the juvenile court terminated her parental rights to both children. Father is the biological father of only J.; he has no legal rights to P. and therefore his parental rights were terminated only as to J.

## A. Father

Father challenges as clearly erroneous the juvenile court's conclusions that 1) there is a reasonable probability that the conditions that resulted in J.'s removal from the home will not be remedied and 2) the plan for J. to be adopted by Grandmother is satisfactory.

### 1. Remedy of Conditions

In determining whether the evidence supports the juvenile court's finding that Father was unlikely to remedy the reasons for J.'s removal, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d at 643. "First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* (quotations and citations omitted).

[18]	In the second step, a parent's fitness to care for his child must be judged at the time of the termination hearing, taking into consideration evidence of changed conditions. *Matter of K.T.*, 137 N.E.3d 317, 326 (Ind. Ct. App. 2019). The parent's habitual patterns of conduct must also be evaluated to determine the probability of future neglect or deprivation of the child. *Id.* "The [juvenile] court is entrusted with balancing a parent's recent improvements against habitual patterns of conduct." *Matter of J.S.*, 133 N.E.3d at 715. In doing so, it may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *In re W.M.L.*, 82 N.E.3d 361, 367 (Ind. Ct. App. 2017). But such a determination "must be founded on factually-based occurrences as documented in the record—not simply speculative or *possible* future harms." *In re V.A.*, 51 N.E.3d 1140, 1146 (Ind. 2016). DCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Ma.J.*, 972 N.E.2d 394, 401 (Ind. Ct. App. 2012).

[19]	Here, the record shows that DCS removed J. from the home and placed him in relative care due to lack of supervision and Mother's and Father's serious substance abuse issues. DCS became involved with the family this time when J. was found running barefoot in the street outside the family home while Mother slept inside. When DCS first met with Father, he refused to take a drug test but did admit to having recently used opiates and marijuana. A drug screen shortly after this meeting was positive for fentanyl.

[20] Evidence at the termination hearing revealed that Father's involvement with heroin dates back to at least 2009, when he was charged in two causes with Class B felony dealing in heroin. He eventually pleaded guilty to possession of heroin, a Class C felony, and voluntarily relinquished his parental rights to his two older children because of the criminal case. Despite knowing firsthand the serious and wide-ranging consequences of drug use, Father continued to use heroin and other illegal drugs with regularity throughout the proceedings, testing positive for drugs on nearly ninety percent of his drug screens. Olejnik, the family's case manager for over a year, described Father's pattern of making a plan to address his addiction as hearings approached and then failing to follow through. And indeed, the evidence shows he had tried and failed to complete a handful of treatment programs throughout these proceedings, only successfully completing a program within thirty days of the termination hearing. But even after successfully completing that program, he admitted to having used heroin twice, including the day before the hearing. *See* Tr., Vol. II at 50 (Father testifying, "I've been clean what four months or something like that, but I had two slips."). And he refused to take drug tests the last two months before the hearing.

[21] Father argues the evidence shows that he "successfully completed substantive services that directly addressed the reasons for removal[,]" citing his completion of the parenting assessment, substance abuse evaluation, individual substance abuse therapy, random drug screens, and inpatient drug treatment. [Father's] Appellant's Brief at 9-10. We agree the evidence shows he completed the

parenting assessment, parenting education, and substance abuse evaluation. His participation in individual substance abuse therapy was inconsistent, however. And although he did submit to random drug screens, he almost always tested positive for one or more illegal substances. Completing random drug screens means very little if the results are consistently positive for drugs. *See id.* at 9 (stating Father "completed . . . random drug screens"). He only managed to complete a treatment program within thirty days of the termination hearing, and we would not say that he "successfully completed" that program given that he admitted to using heroin again the day before the hearing. Participation in services alone is insufficient; it must be accompanied by positive changes, and the fact that Father was unable for nearly two years to complete a treatment program, continued to regularly test positive for drugs, and then "slipped up" after allegedly being drug free for four months by using heroin the day before the hearing indicates Father has not made great strides toward rectifying his drug abuse. For that same reason – lack of progress – Father's plea for more time to tackle his addiction rings hollow, as he did not productively use the time he has already been given, all while J. has been in limbo.

[22]     The juvenile court found that Father was not in compliance with the case plan for reunification because Father had not put in the effort necessary to achieve a sober lifestyle and therefore had not remedied the original allegations of neglect. The juvenile court further found that the likelihood of Father committing to and completing services that would remedy the conditions was "very remote[.]"

[Father's] Appellant's App., Vol. 2 at 5; *see In re J.S.*, 133 N.E.3d at 715 ("The trial court has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior.") (internal citation and quotation omitted). These findings clearly and convincingly support the juvenile court's judgment that the conditions that resulted in J.'s removal will not be remedied.[3]

## *2. Satisfactory Plan*

Father also contends the juvenile court's conclusion that there is a satisfactory plan for the care and treatment of J. is clearly erroneous. He argues that if Grandmother adopts J., "it stands to reason that as long as [she] maintains contact with the parents, the parent child relationship has not been meaningfully terminated." [Father's] Appellant's Br. at 11.

Pursuant to Indiana Code section 31-35-2-4(b)(2)(D), DCS must provide sufficient evidence that there is a satisfactory plan for the care and treatment of the child. We have held that such plan need not be detailed; it just must offer a general sense of the direction in which the child will be going after the parent-

---

[3] Father states in his brief that the "child is so connected with Father that he has expressed a desire to return home to Father's care [and f]ailure to reunify the child with Father would upset the child." [Father's] Appellant's Br. at 6. However, this misrepresents both the relationships between the parties and Grandmother's testimony. Grandmother testified that *P.* wanted to return home to *Mother* and that *P.* would probably be upset when he learns that he was going to be adopted by Grandmother instead. *See* Tr., Vol. II at 144-45. But it is Father's parental rights to *J.* that are at issue here.

child relationship is terminated. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). We have also held that we need not address at this stage whether a particular person is a suitable adoptive parent, because "it is within the authority of the adoption court, not the termination court, to determine whether an adoptive placement is appropriate." *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied*. In *J.C.*, the mother argued DCS did not have a satisfactory plan for the children because they were in a pre-adoptive placement with the paternal grandmother and the paternal grandmother might allow them to have a relationship with the father if she was allowed to adopt. We held that the evidence supported the juvenile court's finding that adoption was an adequate plan for the children's future care and noted that such finding was not tantamount to a decision that the children would be adopted by a specific person. *J.C.*, 994 N.E.2d at 290. Likewise here, DCS stated the plan was for J. to be adopted and the juvenile court determined that adoption was a satisfactory plan for his future care and treatment. The question of who should adopt him was not before the juvenile court. If Grandmother desires to adopt J., she will have to show an adoption court that such adoption is in J.'s best interests at that time. *See In re C.D.*, 141 N.E.3d at 856 (responding to parents' argument that they have a fundamental right to choose who will adopt their child following termination by noting that "the question of who is the more suitable adoptive party for [the child] will be determined by the adoption court").

### 3. Summary

The juvenile court's findings that there is a reasonable probability that the conditions that resulted in J.'s removal from Father's care will not be remedied and that adoption is a satisfactory plan for his future care and treatment are supported by clear and convincing evidence. The juvenile court's order terminating Father's parental rights to J. is therefore not clearly erroneous.

# B. Mother

Mother challenges as clearly erroneous the juvenile court's conclusions that 1) there is a reasonable probability that the conditions that resulted in P. and J.'s removal from the home will not be remedied, 2) there is a reasonable probability the continuation of the parent-child relationship will harm the well-being of the children, and 3) termination is in the children's best interests.

### 1. Remedy of Conditions

As with Father, we must identify the conditions that resulted in the children's removal and then determine whether there is a reasonable probability those conditions will not be remedied. *In re E.M.*, 4 N.E.3d at 643. And again, the children were removed from the home due to lack of supervision and Mother's and Father's serious substance abuse issues. The family came to the attention of DCS when police were called because J. was running barefoot in the street outside the family's home in December. Mother was asleep in the home and police were only able to wake her when they entered the home through the open door and physically shook her. Mother and Father immediately left town

and did not make themselves available to DCS for three weeks. The family had previously been involved with DCS because Mother had used heroin while she was pregnant with J. and he tested positive at birth. DCS asked Mother to take a drug screen as part of its current investigation, but she declined and DCS had to obtain a court order to compel her to submit to a screen. She tested positive for heroin, fentanyl, morphine, and codeine.

[28] Evidence at the termination hearing showed that despite being offered numerous treatment programs and other opportunities to address her addiction, Mother continued to use drugs throughout these proceedings, including as recently as a couple of days before the termination hearing. She was a no-show at the majority of her random drug screens and she regularly tested positive at the ones she did take. She only participated in fifteen out of at least 100 sessions offered for individual substance abuse therapy. She did complete one intensive outpatient treatment program but did not complete the aftercare classes and continued to test positive for drugs afterwards until she eventually refused to take any more drug tests.

[29] Mother argues that she "was compliant throughout the case, except for substance use[.]" Brief of the Appellant, C.T. at 10. And we agree that she did complete the substance abuse evaluation, parenting assessment, and parenting education that she was ordered to complete as part of the participation plan in the CHINS case. She also regularly attended supervised visitation with the children, and it is undisputed that she and the children are bonded. But substance abuse is the very reason the children were removed, and Mother's

substance use continued up to a few days before the termination hearing. She therefore did not show progress with respect to remedying the primary condition keeping the children out of her care – getting control of her addiction.

[30]     Mother asks for more time to address her addiction, arguing that due to the severity of her addiction, it would not be unreasonable to give her additional time to tackle this issue. She cites *In re H.T.*, 901 N.E.2d 1118 (Ind. Ct. App. 2009), for the proposition that continuing the CHINS wardship would cause the children no harm. In *H.T.*, the father was incarcerated shortly before his child's birth. He had been in a relationship with the child's mother and had attended birthing classes with her. After the child's birth, he called from prison every week to speak with her, even after the mother began a relationship and eventually had a child with another man. While in prison, the father participated in a program through which he earned a bachelor's degree and an attendant three-year reduction in his sentence. He also completed a substance abuse program and parenting classes. In the meantime, the child and her stepsibling were adjudicated CHINS and placed with the stepsibling's grandparents. The father then began trying to correspond with his child through the grandparents. When DCS filed a petition for involuntary termination of the father's parental rights, the father began corresponding with the child's guardian ad litem and the family case manager. One hour after being released from prison, the father appeared at the guardian ad litem's office, and the guardian ad litem contacted DCS to find out when the father could start

court-ordered services. DCS refused to offer him any services and one month later, a termination hearing was held, and the father's rights were terminated.

[31] The juvenile court found that the father was willing and able to complete any services required to become the custodial parent of his child. But the juvenile court also found that Father was "too late." *Id.* at 1122. We disagreed, noting that continuation of the CHINS wardship while the father completed services and established a relationship with the child would have no negative impact on her given that he had done all he could do while incarcerated and his fitness was not in question. "Simply put, there is no need for the extreme measure of permanently terminating [f]ather's right to be a parent to his daughter." *Id.*; *see also In re K.E.*, 39 N.E.3d 641, 647-49 (Ind. 2015) (reversing termination of parental rights of father who was to be incarcerated for two more years at the time of the termination hearing, holding that "[g]iven the substantial efforts that [f]ather is making to improve his life by learning to become a better parent, establishing a relationship with [his children], and attending substance abuse classes . . . there is seemingly nothing else that [f]ather could have been doing to demonstrate his dedication to obtaining reunification" and therefore, the juvenile court's conclusion that the father cannot remedy the conditions that led to removal was clearly erroneous).

[32] As *H.T.* and *K.E.* demonstrate, additional time to allow a parent to address the precipitating conditions for removal is sometimes warranted. But in both those cases, the parents showed improvement in addressing those conditions. Here, Mother has shown little to no improvement in addressing her addiction. She

was still using heroin as of a few days before the termination hearing. Under these circumstances, the juvenile court's conclusion that there was a reasonable probability her addiction would not be remedied was not clearly erroneous.[4]

## 2. Best Interests

Mother also contends the juvenile court's conclusion that termination is in the best interests of the children is clearly erroneous.

In determining whether termination of parental rights is in the best interests of a child, the court is required to look at the totality of the evidence. *Z.B*, 108 N.E.3d at 903. In doing so, the court must subordinate the interests of the parents to those of the children involved. *Id*. The testimony of service providers may support a finding that termination is in the child's best interests. *Id*.

Olejnik, the family's first case manager, testified at the termination hearing that she believed termination was in the children's best interests because of the "ongoing substance abuse, the lack of supervision from the beginning of the case, the lack in treatment programs, completion of programs, [and]

---

[4] Mother also argues the juvenile court's conclusion that there was a reasonable probability the continuation of the parent-child relationship threatened the well-being of the children was clearly erroneous. One, we need not address this issue because, as noted above, *supra* n. 2, the juvenile court need only find DCS has proven one of the provisions of Indiana Code section 31-35-2-4(b)(2)(B) in order to terminate a parent's rights. And two, there is a reasonable probability the continuation of the parent-child relationship poses a threat to the well-being of the children for the same reasons there is a reasonable probability the conditions that resulted in their removal will not be remedied: Mother has not demonstrated she is capable or even willing to get and stay sober.

maintaining those clean drug screens." Tr., Vol. II at 85. She also testified she never considered returning the children to their parents' care during her time with the family. The court appointed special advocate ("CASA") also testified that he believed termination was in the children's best interests, noting that by the parents' own admission, "they have serious drug problems that they are at step one of attempting to resolve. And while we wish them success in doing so, two years is certainly long enough that these children need to wait." *Id.* at 160. And Abell, the family's most recent case manager, testified that termination and adoption was in the children's best interests because it would provide permanency for the children: "Right now, they're kind of in the position that they're not certain where they are going to end up or what's going to happen." *Id.* at 117.

[36]   Based on the totality of the evidence, including Mother's failure to show any commitment to remedying her substance abuse that led to the children's removal from her care; her prior history with DCS; and the testimony from two family case managers and the CASA recommending termination and adoption, the juvenile court's conclusion that termination of Mother's parental rights is in the children's best interests is not clearly erroneous. *See In re A.I.*, 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (concluding that the testimony of the CASA and the family case manager, coupled with the evidence that the conditions resulting in the continued placement outside the home will not be remedied, is sufficient to prove by clear and convincing evidence that termination is in the child's best interest), *trans. denied*.

### *3. Summary*

The juvenile court's order terminating Mother's parental rights is not clearly erroneous because the findings that there is a reasonable probability that the conditions that resulted in P. and J.'s removal from Mother's care will not be remedied and that termination is in the best interests of the children are supported by clear and convincing evidence.

# Conclusion

Although it is apparent from the record that the parents love their children and were compliant with some of their services, they have not made progress in the services that matter most: those that will help them overcome their heroin addiction and remain sober so that they may competently parent their children. The juvenile court's findings clearly and convincingly support its judgment and the termination of Father's and Mother's parental rights is not clearly erroneous.

Affirmed.

Crone, J., and Brown, J., concur.