# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 21 2020, 8:51 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle Sheff
Sheff Law Office
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of C.L. (Minor Child)

and

J.M. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

December 21, 2020

Court of Appeals Case No. 20A-JT-318

Appeal from the Marion Superior Court

The Honorable Mark A. Jones, Judge

The Honorable Ryan K. Gardner, Magistrate

Trial Court Cause No. 49D15-1906-JT-596

**Crone, Judge.**

## Case Summary

[1] J.M. (Mother) appeals an order involuntarily terminating her parent-child relationship with C.L. (Child). She claims that she was denied due process when the trial court denied her oral motion for a continuance and in the treatment that she received from service providers. She also challenges the sufficiency of the evidence to support the termination order. We affirm.

## Facts and Procedural History

[2] Child was born in July 2006 to Mother and L.L. (Father).[1] On March 27, 2017, Child and her three siblings were removed from Mother and placed in kinship care after Mother tested positive for buprenorphine, methamphetamine, heroin, and morphine. The following day, the Indiana Department of Child Services (DCS) filed a petition seeking to have Child and her siblings adjudicated as children in need of services (CHINS). The CHINS petition alleged that Mother had failed to provide the children with a safe, stable living environment free from substance abuse, that Mother had a criminal history related to drug use, and that Mother had a history with DCS and juvenile court regarding two informal adjustments. Mother admitted to the CHINS allegations, and the trial court adjudicated the children as CHINS on June 28, 2017. That same day, the

---

[1] Father signed a consent to adoption and is not participating in this appeal. We will address Father only as relevant to Mother's case.

court issued its dispositional decree ordering Mother to participate in home-based therapy and case management, to undergo a substance abuse assessment and successfully complete all treatment recommendations, to submit to random drug screens, and to engage in supervised visitation.

[3] In the fall of 2017, Mother requested and was denied a temporary in-home trial visit with Child, and Child's placement was changed to her paternal grandmother's home. Child was placed with Father at his mother's home in a temporary trial visit for three months, but when Father expressed his desire to discontinue the arrangement, Child was placed in therapeutic foster care. Mother failed to attend permanency hearings in January and April 2018, and sought and was granted a continuance in December 2018. Child's placement was changed to two different foster homes in January and April 2019, with the latter being a preadoptive foster family. Meanwhile, Mother failed to attend permanency hearings in February and June 2019.

[4] At the June 2019 hearing, the trial court changed the permanency plan from reunification to adoption, emphasizing the negative effects of Mother's drug use on her ability to parent and her failure to engage in treatment to address her substance abuse issues. The following day, DCS filed a petition to terminate Mother's relationship with Child. Mother failed to attend an October 2019 review hearing. The trial court conducted a factfinding hearing on December 9, 2019. Mother attended and requested a continuance to give her more time to complete a substance abuse assessment. Her request was denied, and the hearing proceeded, with the various service providers testifying that termination

and adoption are in Child's best interests. At the close of the hearing, the trial court set a date of January 6, 2020, for the remainder of the factfinding. On December 13, 2019, DCS sent Mother written notice of the upcoming January hearing.

[5] Mother failed to appear for the January 6 hearing. Her counsel orally moved for a continuance, claiming that Mother had notified him that she lacked transportation and would not be able to attend the hearing. The trial court denied the motion, and the hearing proceeded. DCS family case manager (FCM) Austin Arnold testified that she had regularly provided bus passes for Mother and that Mother would pick them up. She explained that Mother had notified her that her most recent bus pass had expired and that she needed an updated pass. She testified that she had gotten Mother the updated pass but could not recall whether she had specifically told Mother that the pass was waiting for her at the front desk of the westside DCS office, where she customarily left the passes for Mother to pick up. The trial court issued an order with findings of fact and conclusions thereon, terminating Mother's parental relationship with Child. Mother now appeals. Additional facts will be provided as necessary.

## Discussion and Decision

## Section 1 – Mother's due process rights were not violated.

[6] Mother asserts that her procedural and substantive due process rights were violated. When seeking to terminate a parent-child relationship, the State must

satisfy the requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1120 (Ind. Ct. App. 2013). This means that the State must proceed in a fundamentally fair manner that affords parents the opportunity to be heard at a meaningful time and in a meaningful manner. *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011). In termination cases, this requires the trial court to balance three factors: "(1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure." *In re K.D.*, 962 N.E.2d 1249, 1257 (Ind. 2012) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). A parent has a substantive due process right to raise her children, which means that DCS "must have made reasonable efforts to preserve and/or reunify the family unit." *In re T.W.*, 135 N.E.3d 607, 615 (Ind. Ct. App. 2019), *trans. denied* (2020).

[7] Mother first alleges that she was denied procedural due process when the trial court denied her oral motion for continuance. A trial court's ruling on a motion for continuance ordinarily is a matter within its discretion; we review a trial court's denial of a motion for continuance for an abuse of discretion. *Rowlett v. Vanderburgh Cnty. Office of Family & Children*, 841 N.E.2d 615, 619 (Ind. Ct. App. 2005), *trans. denied* (2006). Mother's counsel sought a continuance when Mother failed to appear for the second day of the factfinding hearing. Counsel did not assert that a denial of the motion would result in a due process violation. Mother's attendance record throughout the pendency of

the CHINS and termination proceedings shows that she had failed to appear for five previous hearings[2] and that her counsel expressed surprise when she *did* appear for the first day of the termination factfinding. *See* Tr. Vol. 2 at 12 ("[M]y client is here. I – I didn't know she was gonna – uh, whether she could make it or not."). The trial court denied counsel's oral motion and conducted the second day of the hearing in absentia.

[8] Only now does Mother frame her argument in terms of due process, claiming that she had a constitutional right to be heard. Our supreme court has emphasized that a parent's right to be heard does not mean that the parent has an absolute right to be physically present at the hearing. *In re K.W.*, 12 N.E.3d 241, 248-49 (Ind. 2014). A parent's appearance by counsel has been held to satisfy the requirements of due process. *See, e.g., Hite v. Vanderburgh Cnty. Office of Family & Children*, 845 N.E.2d 175, 184 (Ind. Ct. App. 2006) (finding no due process violation where incarcerated father appeared only by counsel at permanency hearing).

[9] Although procedural irregularities during CHINS and termination proceedings may be of such significance that they deprive a parent of procedural due process, the parent must raise due process at the trial level to avoid waiver. *S.L.*, 997 N.E.2d at 1120; *see also McBride v. Monroe Cnty. Office of Family &*

---

[2] Mother missed five hearings before the missed factfinding hearing about which she now complains. *See* Petitioner's Exs. 16, 21, 29, 36, 37 (showing Mother's failure to appear at five previous hearings during the pendency of the CHINS and termination proceedings).

*Children*, 798 N.E.2d 185, 194-95 (Ind. Ct. App. 2003) (a party may waive a constitutional claim, including due process, by raising it for first time on appeal). Here, Mother was present by counsel, who argued that FCM Arnold should have confirmed with Mother that she had left the requested bus pass at the front desk. Counsel did not argue that Mother lacked notice of the hearing, and the record includes ample evidence that she had been given notice. She not only knew the date and time of the hearing but also was aware that she was scheduled to testify on her own behalf. In failing to raise procedural due process below, Mother did not provide the trial court "a bona fide opportunity to pass upon the merits" of her claim before seeking an opinion on appeal. *Endres v. Ind. State Police*, 809 N.E.2d 320, 322 (Ind. 2004). Thus, she has waived the issue for our consideration.[3]

[10] Mother also claims that DCS personnel engaged in a pattern of callousness and dereliction of duty that amounted to a substantive due process violation sufficient to survive waiver. As support, she relies on *T.W.*, 135 N.E.3d at 618, where another panel of this Court reversed a termination order, holding that the

---

[3] Mother also claims that the termination statute is unconstitutional on its face because it does not include provisions requiring DCS to provide services and requiring the trial court to grant a continuance to a parent who cannot attend the factfinding hearing. Because she did not raise this below, she has waived it for consideration on appeal. *S.L.*, 997 N.E.2d at 1120. Waiver notwithstanding, we note that DCS did refer (and re-refer) Mother for services. Moreover, with respect to Mother's claim regarding a continuance to ensure a parent's physical attendance, we note that termination by definition becomes the permanency plan only when the parent has failed to meet his or her obligations with respect to appearing for and progressing in court-ordered services, visitation, and the like. Here, Mother failed to attend six hearings and has no proverbial leg to stand on when it comes to arguing that she must be afforded another continuance before her parental rights may be terminated.

father's due process rights were violated where DCS had "wholly failed to make reasonable efforts" to preserve the parent-child relationship to the point of creating a risk of an erroneous filing of a termination petition. In *T.W.*, DCS failed to assist the father in several significant ways. First, after the father took the steps necessary to establish paternity, the FCM failed to forward the paperwork to the right place to finish the process. *Id.* at 616. Second, DCS referred the father for drug screens, but the FCM failed to follow up to ensure that the now-homeless father received the paperwork, which the FCM had sent to a previous address. *Id.* Third, DCS referred the father for visits, but when he arrived for his first visit, he was informed that DCS had canceled the referral entirely. *Id.* at 616-17. When questioned about the cancellation, the FCM testified that he decided to cancel the referral because the child had never met the father, who had recently been released from incarceration. *Id.* at 617. Fourth, DCS agreed to make a referral for a parent aide to help the father with all of the aforementioned matters and did not do so. *Id.* The *T.W.* court held that despite the father's failure to raise due process below or on appeal, DCS's overall pattern of dereliction of duty amounted to a denial of his due process rights. *Id.* at 613, 618.

[11] Here, the service providers did not engage in a pattern of dereliction of duty; rather, they referred and re-referred Mother for court-ordered services, only to have her fail to complete them each time. Mother's complaint with respect to the bus pass is illustrative of the measures taken by DCS and other service providers to help her with her various needs, specifically transportation. During

the factfinding hearing at issue, counsel's argument was not that FCM Arnold had failed to provide Mother with transportation via a bus pass; rather, it was that FCM Arnold had failed to *confirm* with Mother that she had left the promised bus pass at the front desk.[4] To the extent that Mother points to DCS's failure to arrange a referral for a new home-based caseworker for her in the four weeks between the factfinding hearings, we note that the hearings were held on either side of the Christmas and New Year's holidays and that the alleged delay in appointment did not affect Mother's bus pass, which had been ready and waiting for her to pick up since before Christmas. As for Mother's claim that FCM Arnold came across as callous during her testimony, this is not an assessment that we can make as a reviewing court based on the reading of the transcript of her testimony. What we did see in the transcript was example after example of service providers working to help Mother with matters such as transportation and housing, e.g., working to find a bed for her in a shelter when she was homeless, and to accommodate her need for flexible hours from service providers. We simply do not find in the record a pattern of callous disregard or

---

[4] Mother challenges finding 49, claiming that it is "dismissive." Appellant's Br. at 31. Finding 49 states,

> FCM provided bus passes for Mother on an almost monthly basis, and her routine was to leave them at the front desk for Mother. Mother was aware of this, and had previously picked up her bus passes from the front desk. FCM left bus passes as the front desk prior to the second day of trial, which Mother did not attend.

Appealed Order at 6. This finding is supported by FCM Arnold's testimony concerning what she had done with the bus passes in the past and what she did this time. Even so, Mother does not claim that FCM Arnold failed to leave the pass at the desk but that she did not confirm that the pass was there. The record is replete with testimony from various service providers concerning their difficulty in maintaining communication with Mother due to her cell phone constraints and her inconsistent record of returning text messages. Finding 49 is neither dismissive nor erroneous.

dereliction of duty, as Mother suggests. Thus, *T.W.* is distinguishable. We therefore conclude that Mother's substantive due process claim lacks merit.

## Section 2 – Mother has failed to establish that the trial court clearly erred in terminating her parental relationship with Child.

Mother contends that the trial court erred in terminating her parental relationship with Child. When reviewing a trial court's findings of fact and conclusions thereon in a case involving the termination of parental rights, we first determine whether the evidence supports the findings and then whether the findings support the judgment. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We will set aside the trial court's judgment only if it is clearly erroneous. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re A.G.*, 45 N.E.3d 471, 476 (Ind. Ct. App. 2015), *trans. denied* (2016). Unchallenged findings stand as proven. *T.B. v. Ind. Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012), *trans. denied*. In conducting our review, we neither reweigh evidence nor judge witness credibility. *E.M.*, 4 N.E.3d at 642. Rather, we consider only the evidence and inferences most favorable to the judgment. *Id.* "[I]t is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by the appellant before there is a basis for reversal." *Best v. Best*, 941 N.E.2d 499, 503 (Ind. 2011) (citations omitted).

[13] "Parents have a fundamental right to raise their children – but this right is not absolute. When parents are unwilling to meet their parental responsibilities, their parental rights may be terminated." *Matter of Ma.H.*, 134 N.E.3d 41, 45-46 (Ind. 2019) (citation omitted), *cert. denied* (2020). To obtain a termination of a parent-child relationship, DCS is required to establish in pertinent part:

> (A) that one (1) of the following is true:
>
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> ….
>
> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[14] In recognition of the seriousness with which we address parental termination cases, Indiana has adopted a clear and convincing evidence standard. Ind. Code § 31-37-14-2; *In re R.S.*, 56 N.E.3d 625, 629 (Ind. 2016). "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013) (citation omitted). "[I]f the court finds that the allegations in a [termination] petition … are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added).

### A. *Reasonable probability that the conditions that resulted in Child's removal from or placement outside the home will not be remedied*

[15] Mother asserts that the trial court clearly erred in concluding that a reasonable probability exists that the conditions that led to Child's removal or continued placement outside the home will not be remedied.[5] When assessing whether there is a reasonable probability that conditions that led to a child's removal will not be remedied, we must consider not only the initial basis for the child's removal but also the bases for continued placement outside the home. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Moreover, "the

---

[5] Mother also challenges the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being. Indiana Code Section 31-35-2-4(b)(2)(B) requires DCS to prove only one of the three circumstances listed. Because we find no error concerning the first, we need not address the second.

trial court should judge a parent's fitness to care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *E.M.*, 4 N.E.3d at 643. "Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *J.T.*, 742 N.E.2d at 512. In making its case, "DCS need not rule out all possibilities of change; rather, [it] need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[16] Mother challenges the following findings of facts related to the reasonable probability of unremedied conditions:

> 50. When FCM attempted to serve Mother with the TPR subpoena and petition, Mother texted FCM that "little white girls shouldn't be in this neighborhood late." Mother then stopped responding to FCM's text messages.
>
> 51. It is the opinion of FCM Arnold that: (1) Mother has not consistently engaged in services; (2) Mother has not progressed in services; (3) Mother has not remedied the conditions that led to the removal and retention of the Child from her custody ….
>
> 52. Mother failed to consistently participate in supervised parenting time. Mother was attending one visit per month when four visits per month were scheduled. The Child knew that

visitation was supposed to occur, and Mother's failure to attend visits negatively impacted the Child. When Mother did attend visitation, she engaged in inappropriate conversations with the Child, which negatively impacted the Child. Mother has not visited with the Child since her visits were suspended in February of 2019.

….

58. [Guardian ad litem] Ms. Box believes that Mother's inconsistency with visits and inappropriate conversations with the Child during visits contributed to placement disruptions for the Child. The Child had six different placements throughout the CHINS matter.

Appealed Order at 6-7.

[17] Mother challenges finding 50 as irrelevant. Although we find the trial court's inclusion of the quotation to be an odd choice, we find the information in it to be probative of DCS's efforts and Mother's noncooperation, both of which are reflected in the record. As for the remaining findings, Mother simply disagrees with the service provider's opinions that she was not making progress with respect to services and does not believe that her conversations during visitation should be deemed inappropriate. However, the record confirms Mother's lack of progress in services, her poor attendance at visitation, and the sometimes negative effect that her conversations had on Child when she did visit her. The record also shows that Mother's prevailing course of conduct was either to avoid services or to participate sporadically, which resulted in those services either being placed on hold or discharged and sometimes re-referred. Her

challenges to these findings are invitations to reweigh evidence and reassess credibility, which we may not do. In short, Mother did not avail herself of the many services aimed at improving her life as an individual and as a parent.

[18] Nor did Mother avail herself of the opportunities to visit and establish a bond with her adolescent Child. She attended an average of only one visitation session out of the four scheduled sessions each month, and when she did attend, she often conversed with Child about inappropriate subjects. When the service provider picked up Child and her siblings for visits with Mother, they would sit in her vehicle outside Mother's place waiting to see whether Mother would emerge. All too often, they pulled away without Mother and had to settle for sibling visitation without her. Child, who had a stellar record of attending court hearings and visitation, noticed Mother's familiar refrain of nonattendance. Sadly, Mother failed to visit Child at all in the ten months immediately preceding the December 2019 factfinding hearing. This pattern of conduct reflects Mother's lack of commitment to preserving her relationship with Child. *See Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007) (failure to exercise right to visit one's children demonstrates lack of commitment to complete actions necessary to preserve parent-child relationship), *trans. denied*.

[19] Mother's most pervasive and persistent problem was her substance abuse, which was the catalyst for Child's initial removal from the home. A trial court may properly consider evidence of a parent's substance abuse, criminal history, lack of employment or adequate housing, history of neglect, and failure to

provide support. *McBride*, 798 N.E.2d at 199. In 2011, when Child was five years old, Mother was convicted of class D felony possession of pseudoephedrine. Yet, she continued to use multiple drugs. She did not submit to random drug screens as ordered, and submitted to only one screen between January and December 2019. Her addiction has plagued her for nearly a decade and has cost her dearly in terms of housing, employment, and caring for her children, for whom she cannot provide a safe living environment. She was given several opportunities to address her problem and turn her life around, yet she did not complete her court-ordered substance abuse treatment. Instead, she waited until the first day of the factfinding hearing to request a continuance so that she could have more time to complete a substance abuse assessment and engage in drug treatment. By that time, the CHINS and termination proceedings had spanned nearly three years. Mother was afforded ample time to complete treatment and did not do so.

[20] Mother did not have stable housing and lived either with friends or in various hotels. She had a pattern of not responding to text messages from her case managers, and when they came to her residence, she would not allow them inside. Instead, she would either not answer the door or insist on conducting the meeting in the case manager's vehicle. At one point, when she was living in a hotel, she refused to leave her room to meet with her case manager because she had overstayed her check-out time and did not want to be ejected by the hotel staff. In short, Mother was afforded nearly three years to demonstrate that she could turn her life around and provide Child with a safe and stable

living environment.  The trial court found that she did not do so.  Based on the foregoing, we conclude that the trial court did not clearly err in determining that there is a reasonable probability that the conditions that led to Child's removal will remain unremedied.

### B.  Child's best interests

Finally, Mother maintains that the trial court clearly erred in concluding that termination is in Child's best interests.  To determine what is in the best interests of a child, we must look at the totality of the circumstances.  *In re A.W.*, 62 N.E.3d 1267, 1275 (Ind. Ct. App. 2016).  The trial court "need not wait until a child is irreversibly harmed before terminating the parent-child relationship."  *S.E. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 37, 47 (Ind. Ct. App. 2014), *trans. denied*.  Although not dispositive, permanency and stability are key considerations in determining the child's best interests.  *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009).  "A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children."  *In re A.P.*, 981 N.E.2d 75, 82 (Ind. Ct. App. 2012) (quoting *Lang*, 861 N.E.2d at 373).  Likewise, "the testimony of the service providers may support

a finding that termination is in the child's best interests."[6] *In re A.K.*, 924

N.E.2d 212, 224 (Ind. Ct. App. 2010), *trans. dismissed*.

[22]    Mother challenges the following findings relating to Child's best interests:

> 51.  It is the opinion of FCM Arnold that:  … (4) it is in the best
> interests of the Child to terminate the parent-child relationship;
> (5) the foster parents' home is appropriate, and there are no
> safety concerns; and (6) adoption of the Child by the current
> caregivers is a satisfactory plan for the care and treatment of the
> Child.
>
> ….
>
> 53.  The Child has been placed with the foster parents since April
> of 2019.  The Child is doing very well and is bonded with the
> foster parents.  She looks to her foster mother for guidance.  The
> Child has blossomed and is adjusting well.  She is now active in
> dance, and is open to talking about how she feels and what she
> wants.  The foster parents want to adopt the Child and can
> provide for all her needs.
>
> 54.  The Child's behaviors in school have decreased.  Home-
> based therapy, tutoring, sibling visits, and visits with Father are
> in place for the Child.
>
> 55.  Both FCM and [home-based case manager] Ms. Evans
> believed that Mother appeared different on December 9, 2019
> than she had previously, Mother had been very skinny when
> FCM first met her, and appeared healthier on the first day of

---

[6] Mother appears to claim that the service providers made their recommendations based solely on their belief that the preadoptive foster parents can provide a "better" home for Child.  *See In re R.A.*, 19 N.E.3d 313, 321 (Ind. Ct. App. 2014) (mere fact that children are in better home cannot be sole basis for termination), *trans. denied* (2015).  The record simply does not support this assertion.

trial.

56. Megan Schlegel has been the Child's home-based therapist since August 21, 2019. Ms. Schlegel is addressing childhood trauma and coping skills with the Child. Ms. Schlegel believes that the foster home is a good placement for the Child. The Child feels secure that she has a permanent home no matter what she does. Ms. Schlegel supports the plan of adoption, and believes that the foster mother has been a huge support for the Child.

57. Child Advocates assigned Joyce Box as the GAL to represent and protect the best interests of the Child. GAL Box finds the placement to be appropriate and satisfactory, and believes that all the Child's needs are met in the foster home. GAL Box believes that: (1) adoption is in the Child's best interests; (2) adoption should be the permanency plan for the Child; and (3) the parental rights of Mother should be involuntarily terminated.

58. Ms. Box believes that Mother's inconsistency with visits and inappropriate conversations with the Child during visits contributed to placement disruptions for the Child. The Child had six different placements throughout the CHINS matter.

Appealed Order at 6-7.

[23] Mother claims that finding 54 is irrelevant and based on innuendo as to Child's behavior at school. We disagree. The service providers testified that Child was doing better in school, both attitudinally and academically. This evidence supports finding 54 and is relevant in assessing how Child has progressed since being placed in her preadoptive foster home. Moreover, we disagree with Mother's characterization of the finding as including innuendo and will not

read into the finding any motive by the trial court to impugn Child or Mother for Child's conduct at school. Findings 51 and 55 through 58 are phrased in terms of a service provider's opinion or beliefs. Generally speaking, such findings would not be considered to be properly stated. *See Parks v. Delaware Cnty. Dep't of Child Servs.*, 862 N.E.2d 1275, 1280-81 (Ind. Ct. App. 2007) (emphasizing that mere recitations of testimony are not proper findings absent trial court's adoption of testimony as fact). However, in the context of determining a child's best interests, it is precisely the opinion/belief of the service provider that is significant. Therefore, these findings are not infirm.

[24] The record confirms these findings. For example, therapist Schlegel supported a permanency plan of adoption and described Child as "flourishing" in her placement with her preadoptive foster family. Tr. Vol. 2 at 79. The record shows that the foster family has given Child security within a new family while, at the same time, strongly supporting Child's need to spend time visiting her biological siblings and that Child's schoolwork and behavior have improved commensurately. FCM Arnold testified that Child has "blossomed" in her placement, is participating in dance (which she always wanted to do), and has a particularly strong bond with her foster mother, who gives her motherly advice, spends time with her one on one, "advocate[s] for her[,]" and "attend[s] to her needs." *Id.* at 103.[7] In contrast, she stressed Mother's poor attendance at

---

[7] Mother argues that testimony concerning "310" reports filed shortly before the first day of the factfinding raises questions about FCM Arnold's opinions concerning Child's best interests. A 310 report is an incident

visitation sessions during the thirty-two-month duration of Child's case, her pattern of partial or noncompliance with drug screens and services, particularly related to addressing her drug addiction, and her haphazard communication with DCS and other service providers. In support of termination and adoption, FCM Arnold articulated that Mother had been afforded ample opportunities to improve and had not done so. GAL Box, who worked on Child's case for nearly two years, also noted the strong bond between Child and her foster family and opined that termination and adoption are in Child's best interests. The totality of the circumstances reflects a thirteen-year-old girl in dire need of the stability and security that has eluded her for most of her life and a mother who lacks the ability to provide them even for herself, let alone for her child. The trial court did not clearly err in concluding that termination is in Child's best interests. Accordingly, we affirm.

Affirmed.

Kirsch, J., and Tavitas, J., concur.

---

report concerning Child in her foster placement. During the second day of the factfinding, FCM Arnold testified that the reports were investigated and assessed and found not to be substantiated. Mother did not raise a challenge to the "satisfactory plan" element of the statute. To the extent that such reports might implicate Child's best interests, we find Mother's arguments to be requests to reweigh evidence, which we may not do.